No. 99-179

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 274

IN RE THE MARRIAGE OF

MARK J. STONEMAN,

Petitioner and Respondent,

v.

RUTH L. DROLLINGER,

Respondent and Appellant.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Ruth L. Stoneman, Olympia, Washington (*pro se*)

For Respondent:

Karl Knuchel, Livingston, Montana

Submitted on Briefs: June 1, 2000
Decided: October 30, 2000

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 Ruth L. Drollinger (Drollinger) appeals from the order of the Eighteenth Judicial District Court, Gallatin County which dissolved her marriage to Mark J. Stoneman, (Stoneman), provided a parenting plan for their four children, and divided the marital property between the two parties.

¶2 We affirm in part and reverse in part the judgment of the District Court, and remand this case for entry of judgment consistent with this opinion.

Issues

¶3 Drollinger alleges a variety of errors by the District Court. They are summarized and discussed in this opinion as follows:

¶4 1. Whether the District Court erred in its definition and division of marital property.

¶5 2. Whether the District Court erred in not awarding maintenance.

¶6 3. Whether the District Court erred in the final child support award and the retroactive reduction in payments.

¶7 4. Whether the District Court erred in allowing Stoneman unsupervised visitation of the children in light of the history of domestic violence.

Factual and Procedural History

¶8 The parties, Mark J. Stoneman and Ruth L. Drollinger were married on October 1, 1988, in Livingston, Montana. A petition for dissolution was originally filed on July 30,

1990. After a series of separations and reconciliations, the couple finally separated in 1996. They now have four children, and an accumulation of property. During the marriage Stoneman provided most of the financial support to the family, while Drollinger cared for the children and the home.

¶9 The relationship between the two parties has been contentious and there is a history of domestic violence. According to the District Court, Stoneman was convicted of domestic abuse in 1990, 1991, 1994, and 1996. He has a long, well-documented history of violent behavior toward Drollinger.

¶10 The trial in this matter took place on June 11, 12, and 13, 1997 and on February 23, 24, and 27, 1998. There were other hearings held by the court on various issues before and after the trial. The court issued its findings of facts, conclusions of law, and order dissolving the marriage and dividing the marital estate on October 23, 1998. The court awarded custody of the children to Drollinger, ordered Stoneman to pay $190 per month, per child in support, and divided the marital property between the two parties. The District Court also allowed Stoneman to have unsupervised visitation with the children.

¶11 In sum, Drollinger appeals the District Court's division and definition of property, the amount of child support, the lack of a maintenance award, and the visitation plan. Other facts will be provided as necessary.

¶12 We should note that the record is replete with evidence not properly submitted to both this Court and the court below. Both sides have abused this process by submitting transcripts without proper certification, information not submitted to the court below in a proper hearing, and evidence that is not properly considered by this Court. We have seen this evidence, but refuse to consider it in making our decisions. Discussion

Issue #1

¶13 **Whether the District Court erred in its definition and division of marital property**.

¶14 Drollinger alleges that the District Court made a variety of errors in its definition and division of marital property. She argues that the District Court erred in excluding certain inherited property owned by Stoneman from the marital estate. In addition, she challenges the District Court's valuation of personal property and its division as well as the division

of the family residence. Finally, she argues that the court erred in its conclusion that certain artwork in the couple's possession belonged to Stoneman's parents.

¶15 In its findings of fact, the court concluded that property inherited by the parties was not part of the marital estate. The court excluded from the marital property land in Idaho owned by Drollinger, and an interest in a farm in Illinois owned by Stoneman. Both properties were inherited by the respective parties. The record shows that a portion of the Illinois property was sold, and the proceeds were used to fund a business venture by Stoneman. Upon the sale of the business, the proceeds were used to purchase buffalo and as partial payment for the vehicle used by Stoneman.

¶16 It is evident that throughout this case, Stoneman has resisted paying child support. The court ordered that the buffalo be sold and that the proceeds be used for unpaid child support and to pay for certain court-approved costs incurred by the parties. In it's findings, the court concluded that the funds used to purchase the buffalo were traceable to the inherited Illinois property and that the proceeds from the buffalo were not a marital asset. Stoneman was given a credit for these proceeds in the final division. Drollinger objects to that credit.

¶17 On appeal, this Court reviews a trial court's division of marital property to determine whether the findings upon which the court relied are clearly erroneous and whether the court correctly applied the law. *In re Marriage of Danelson* (1992), 253 Mont. 310, 317, 833 P.2d 215, 219-20. In reviewing discretionary trial court rulings, including marital estate distributions and the valuations of marital property pursuant to dissolution, we determine whether the district court abused its discretion. *In re Marriage of Rada* (1994), 263 Mont. 402, 405, 869 P.2d 254, 255.

¶18 Distribution of a marital estate is controlled by § 40-4-202(1), MCA, which provides in relevant part:

> In a proceeding for dissolution of a marriage . . . the court, without regard to marital misconduct, shall, and in a proceeding for legal separation may, finally equitably apportion between the parties the property and assets belonging to either or both, however and whenever acquired and whether the title thereto is in the name of the husband or wife or both. . . In dividing property acquired prior to the marriage; property acquired by gift, bequest, devise or descent; property acquired in exchange for property acquired before the marriage or in exchange for property acquired by

gift, bequest, devise, or descent; the increased value of property acquired prior to marriage; and property acquired by a spouse after a decree of legal separation, the court shall consider those contributions of the other spouse to the marriage, including:

(a) the nonmonetary contribution of a homemaker;

(b) the extent to which such contributions have facilitated the maintenance of this property; and

(c) whether or not the property division serves as an alternative to maintenance arrangements.

This section provides for equitable distribution of the property, taking into consideration the contributions of the non-acquiring spouse to its preservation or appreciation. The non-acquiring spouse is entitled to an equitable share of only the appreciated or preserved value of the inherited property which is attributable to his or her efforts. *In re Marriage of Smith* (1994), 264 Mont. 306, 312, 871 P.2d 884, 888; *In re Marriage of Herron* (1980), 186 Mont. 396, 405, 608 P.2d 97, 102; *In re Marriage of Engen,* 1998 MT 153 ¶ 29, 289 Mont. 299, ¶ 29, 961 P.2d 738, ¶ 29. The record shows that Stoneman inherited a share in a piece of property in Illinois from his grandmother. It is clear from the record that neither party worked on the farm, and no marital assets were used in the maintenance or care of the property.

¶19 In *Smith*, we held that "[t]he court cannot distribute to the non-acquiring spouse property acquired prior to the marriage or acquired by gift, bequest, devise, or descent when there is no evidence that the spouse made any contribution to those assets in any form." *Smith,* 264 Mont. at 312, 871 P.2d at 888.

¶20 It is clear from the testimony that in this case, neither spouse contributed to the appreciation or preservation of the property. Neither spouse has worked on the farm in Illinois, nor have they made any sort of sacrifice or contribution that would preserve or increase the value of the farm. The property remained separate throughout the marriage and Drollinger is not entitled to the property simply by virtue of being the homemaker in the family. In order for her to claim an interest, she would have to prove that the value of the property had appreciated during the marriage and that she had somehow contributed to that appreciation in value. See *Smith* 264 Mont. at 312, 871 P.2d at 888. See also, *Herron*

186 Mont. at 405, 608 P.2d at 102. That is simply not the case.

¶21 Drollinger's second argument relating to the Illinois property is that the court did not consider the future liabilities and earnings of the two parties. She argues that the court didn't consider the future economic needs of her and the children, and that it was, as a result, error not to include the Illinois property. There is absolutely no authority for this argument. We find that the District Court thoroughly considered the economic situations of both of the parties. The court awarded use of the family home to Drollinger in order to maintain stability for the children, the court also awarded child support to be paid by Stoneman to Drollinger. There is no evidence to support Drollinger's argument that the Illinois property or the buffalo purchased from its proceeds should have been included in the marital estate. ¶22 Drollinger makes numerous other arguments in an attempt to support her contention that the Illinois property should have been included in the marital estate. We find all of them to be without merit. It is clear that the property in Illinois and proceeds from its partial sale are traceable to the original inheritance and were properly defined as non-marital property.

¶23 We cannot conclude that the District Court should have found the Illinois property or the buffalo purchased with the proceeds to be part of the marital estate. We hold that the District Court did not err in excluding the Illinois farm from the marital estate. We affirm on this issue.

¶24 Drollinger further argues that the marital home should have been awarded to her alone. The District Court awarded use of the home to Drollinger and the children until 2010, or until Drollinger moves, whichever occurs first. At that time, the home is to be sold and the proceeds split by the parties. The court ordered Stoneman to pay half of the mortgage payment in the interim in order to retain his interest.

¶25 Drollinger argues that because she contributed to the increase in value, by adding on to the home and maintaining it, awarding half of the value of the home upon its sale would be unconscionable. The record shows, however, that the court took all relevant factors into consideration. It appears that Stoneman's parents gave the couple money to assist in purchasing the home, and that both parties contributed, in part, to the improvements. The court correctly determined that it would not give credit to either party for gifts from family or for improvements made to the property during the marriage.

¶26 For her argument Drollinger relies on *Torma v. Torma* (1982), 198 Mont 161, 645

P.2d 395. She argues that this Court has found that it was inequitable to order an equal division of the property upon its sale after the children are grown. She argues that if the property is equally divided, Stoneman will unfairly gain from any appreciation in the value of the house.

¶27 Her reliance on *Torma,* however, is misguided as the facts in *Torma* differ substantially from the case at hand. As in this case, the District Court in *Torma* ordered an equal division of the property at sale. Unlike the present case, the husband in *Torma* had not made any payments on the mortgage since the divorce. The wife, who had lived in the home had made all mortgage payments up to the time of sale. *Torma,* 198 Mont. at 167, 645 P.2d at 398-99. Because the District Court ordered Stoneman to pay half of the mortgage payment on the house in order to retain his interest, the District Court order to divide the proceeds was not an abuse of discretion.

¶28 Drollinger also challenges the court's order that certain artwork in the couple's residence be returned to Stoneman's parents. The record shows that the couple received numerous gifts of personal property from Stoneman's parents throughout the marriage. The Court found that most of these were given during the marriage to the couple, and the property was divided between the two parties. Testimony was given however, that the artwork in question was a "loan" from Stoneman's parents and not a gift, and testimony was also offered that the artwork was a gift. The District Court determined that the property belonged to Stoneman's parents and not to the couple.

¶29 This Court is not a fact-finder. Determining ownership of the artwork is within the province of the District Court in its role as a finder of fact. The District Court is in the best position to resolve conflicting testimony. We will not substitute our judgment for the District Court's findings when, as in this case, those findings are based on the credibility of the witnesses. *Engen,* ¶ 46; *In re Marriage of Boyer* (1995), 274 Mont. 282, 288, 908 P.2d 665, 668. We find that there was sufficient evidence to support the District Court's finding that the artwork belonged to Stoneman's parents and that the District Court's finding about the ownership of the artwork was not clearly erroneous.

¶30 Drollinger also questions the District Court's valuation of the personal property. The Court noted that Stoneman submitted a list of property with estimated value attached. Drollinger failed to submit information regarding the valuation of the personal property. The District Court accepted Stoneman's valuation and divided the property between the two parties. Drollinger argues that the District Court erred by not assessing or valuing the

property. In support of this argument she cites *Collett v. Collett* (1981), 190 Mont 500, 621 P.2d 1093. Again, Drollinger misconstrues the meaning of this case. In *Collett* this Court reversed the District Court's division of property because evidence was not presented on easily valued assets such as bank accounts and proceeds from the sale of property. *Collett*, 190 Mont. at 504, 621 P.2d at 1095. In addition, the values offered by the two parties were in dispute.

¶31 The property Drollinger refers to is predominantly *personal* property, including tools and assorted kitchen utensils which would be difficult to place a value on even with testimony. In addition, although she had ample opportunity, Drollinger failed to offer her own valuation at trial. She cannot now argue that the values assigned were incorrect.

¶32 A district court has broad discretion in determining the value of property in a dissolution. "As long as the valuation is reasonable in light of the evidence submitted, we will not disturb the finding on appeal." *In re Marriage of Milesnick* (1988), 235 Mont 88, 94-95, 765 P.2d 751, 755.

¶33 In viewing the record, we cannot find any evidence that the values offered by Stoneman and accepted by the court were unreasonable. Nor do we find that the division of property was inequitable. It is within the District Court's discretion to divide personal property equitably. We do not find that the District Court's valuation and division were clearly erroneous.

¶34 We find nothing in the record to indicate that the District Court abused its discretion in its valuation and division of the marital assets and liabilities. "District courts working in equity, must seek a fair distribution of marital property using reasonable judgment and relying on common sense." *In re Marriage of Kimm* (1993), 260 Mont. 479, 483, 861 P.2d 165, 168. While Drollinger may not agree with the way that the District Court valued and allocated the assets of the marital estate, she has not shown that the District Court erred.

Issue #2

¶35 **Whether the District Court erred by not awarding maintenance.**

¶36 The District Court concluded that Drollinger was not entitled to a cash maintenance award; that in the property division she had received a share sufficient to eliminate a need for a cash maintenance award. Drollinger argues that the court erred in not making a cash

maintenance award. She argues that she is unable to meet her needs and those of the children without such an award.

¶37 We review a district court's award of maintenance to determine if the findings of fact are clearly erroneous. *In re Marriage of Eschenbacher* (1992), 253 Mont. 139, 142, 831 P.2d 1353, 1355.

¶38 The factors to be considered in spousal maintenance awards are found in § 40-4-203 (1), MCA:

> (1) In a proceeding for dissolution of marriage or legal separation . . . the court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:
>
> (a) lacks sufficient property to provide for his reasonable needs; and
>
> (b) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

¶39 The statute requires a showing by the party requesting maintenance that she both lacks sufficient property to provide for her needs *and* that she is unable to support herself. Drollinger has failed to make a showing that she is unable to support herself. Stoneman has been ordered to pay half of the mortgage payment on the home until it is sold in addition to making child support payments. In addition, a review of the record shows testimony by Drollinger that she believes that the property will allow her to expand her horse boarding business to produce more income. She also testified that there is an apartment attached to the house that has been rented in the past, and could be rented in the future. Drollinger has been awarded exclusive use of the home, which provides housing as well as potential income. She has not shown that the decision not to award maintenance by the District Court was clearly erroneous.

¶40 We conclude that the District Court did not err in declining to award maintenance to Drollinger.

Issue #3

¶41 **Whether the District Court erred in the final child support award and the**

**retroactive reduction in payments.**

¶42 Upon the parties' separation, temporary orders of child support and maintenance were entered. Stoneman was to pay $300 per month in temporary spousal maintenance and $200 per month, per child in child support. Later, this temporary order was modified and Stoneman was ordered to pay a total of $800 per month in temporary maintenance and child support. In the final decree, the court ordered Stoneman to pay child support in the amount of $190 per month, per child and did not award any spousal maintenance.

¶43 Drollinger appears to allege three separate errors relating to the issue of child support. She argues that the District Court erred in its reduction of the temporary order of child support, the retroactive modification, and allowing Stoneman a credit against his support obligation with money from the sale of the buffalo.

¶44 The standard of review in a child support award is whether the district court clearly abused its discretion. *In re Marriage of Barnard* (1990), 241 Mont. 147, 152, 785 P.2d at 1387, 1390; *In re Marriage of Benner* (1985), 219 Mont. 188, 192, 711 P.2d 802, 804.

¶45 In the determination of child support, each of the parties submitted financial affidavits disclosing their income and assets. The court also heard testimony regarding the ability to earn income of the parties. The court determined that Drollinger has received income from both the rental of an apartment on the property and from a horse business. In addition, the court determined that given the ages of the children and the costs of child care it would not be advantageous for Drollinger to work outside of the home. It did not impute income to Drollinger. The court found that Stoneman is employable and imputed income to Stoneman on that basis. The District Court determined that under the child support guidelines Stoneman is obligated to pay $190 per month, per child.

¶46 We agree that the amount is substantially in compliance with the Montana Child Support Guidelines and the determination of the District Court was not an abuse of discretion.

¶47 The court also determined that the amount owed by Stoneman to CSED should be recalculated in light of the court's determination, retroactive to September 1996.

¶48 Section 40-4-208(1), MCA, states, "except as otherwise provided in 40-4-201(6), a decree may be modified by a court as to maintenance or support only as to installments

accruing subsequent to actual notice to the parties of the motion for modification." It also provides that modification relating to maintenance or support may only be made, "upon a showing of changed circumstances so substantial and continuing as to make the terms unconscionable." Section 40-4-208(2)(b)(i), MCA.

¶49 Drollinger argues that there was no change in circumstances that would allow the court to modify the amount downward.

¶50 The court, however, was revising a temporary order, not modifying a final decree as specified in § 40-4-208(1), MCA. It is clearly within the District Court's authority to make the maintenance and child support awards retroactive. The temporary order of child support did not prejudice the rights of the parties or the children adjudicated at the later hearings. It is well within a District Court's power, after a hearing on the matter of child support and maintenance, to make the order retroactive. *In re Marriage of Wersland* (1991), 249 Mont. 169, 174, 814 P.2d 991, 993. We conclude that the District Court acted within its discretion when it ordered retroactive revision of the temporary support order.

¶51 We have discussed the issue of whether the buffalo money was properly excluded from the marital assets. As we have determined that the District Court did not err on that issue, we decline to find that it erred in allowing Stoneman a credit for the proceeds from the sale.

Issue #4

¶52 **Whether the District Court erred in allowing Stoneman unsupervised visitation of the children in light of the history of domestic violence.**

¶53 This Court's standard of review for custody and visitation is whether substantial credible evidence supports the district court's judgment. *In re Marriage of Hunt* (1994), 264 Mont. 159, 164, 870 P.2d 720, 723. We will overturn a court's custody or visitation decision only when the court's findings and conclusions clearly demonstrate an abuse of discretion. *Hunt,* 264 Mont. at 164, 870 P.2d at 723.

¶54 Section 40-4-212, MCA, provides in part:

(1) The court shall determine the parenting plan in accordance with the best interest of the child. The court shall consider all relevant parenting factors, which may include but are

not limited to:

> (a) the wishes of the child's parent or parents . . .
>
> (c) the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interest;
>
> (e) the mental and physical health of all individuals involved;
>
> (f) physical abuse or threat of physical abuse by one parent against the other parent or the child;

¶55 Drollinger has been responsible for the care of all four children in the history of this relationship. The findings of the District Court indicate that the children are well-cared for and seem to be relatively well-adjusted given the tumultuous relationship of their parents. Initially, at the recommendation of a therapist, Joseph Scalia (Scalia), visitation between the children and Stoneman was supervised. Scalia later reversed his recommendation, but ultimately withdrew from his role as a supervisor of visitation, noting that he felt that role compromised his ability to treat the children. In addition, Scalia testified at trial that he felt that his objectivity had been compromised because he felt intimidated by Stoneman. Dr. Scalia's recommendation that the District Court began to allow unsupervised visitation appears to have influenced the court's decision. In July of 1997, the court began to allow unsupervised contact. It was also noted in the final conclusions that unsupervised contact was allowed because "there was no evidence that Mark physically abused the children."

¶56 The court observed in its findings and conclusions that Stoneman has a history of violent behavior. Stoneman's convictions for domestic abuse were also noted. In addition, the court commented that in the history of the parties' relationship, "it is clear that Mark resorted to the use of physical violence against Ruth." The Findings and Conclusions detailed several incidents involving Stoneman's violent behavior:

> A disagreement escalated between Mark and Ruth to the point of violence. To protect the children Ruth, who was pregnant at the time, was forced to put them in the Suburban and drive away from Mark. It is uncontroverted that Mark, in his pickup truck, rammed into the Suburban, endangering the lives of his children and Ruth. Mark testified that he was trying to catch up to Ruth because in her hurry to

protect her life and the lives of her children, he thought Ruth had not used seat belts for the children. The Court finds Mark's seat belt explanation incredible versus his threat to the safety of his children and Ruth.

The court continued:

The second incident involved Mark painting his face with camouflage in the presence of the children, drinking, and driving out into the night, after hearing a story about Ruth. Mark's behavior was so bizarre that it frightened his friend Lisa Wolstad. Ms. Wolstad called 911 more than six times out of fear of what Mark would do. . . . Gallatin and Park County deputies pursued Mark and caught him near the I-90 interchange, dressed in camouflage and in possession of a gun.

Nonetheless, the court found that because Mark had been observed several times acting appropriately with the children, unsupervised visitation was suitable.

¶57 A Guardian ad Litem (GAL) was appointed in this case to investigate and to represent the interests of the children. The GAL has consistently opposed unsupervised contact with Stoneman, citing his past history of violence and alcohol abuse. The reports from the GAL detailing her interviews of the children and their therapist indicate that Stoneman has been making threats of violence toward their mother and her family in front of the children as well as making other inappropriate comments. In addition, the GAL reports hostile behavior by Stoneman toward her. She testified to receiving angry phone calls and visits from Stoneman and his family members. She also reported that after observing a visit with Stoneman and the children in December of 1996, Stoneman commented that she would not be allowed at his home again. Stoneman has expressed concern that the GAL has exhibited some bias against him and has requested that this GAL be removed.

¶58 Several therapists have been involved in this case. With one exception, those making a recommendation have opposed unsupervised contact between Stoneman and the children. Psychologists treating the children have reported to the GAL that the actions of Stoneman during visitation are having a negative effect on the children's emotional well-being. Testimony given shows that Scalia, the one therapist who has recommended unsupervised visitation, has since testified that he had come to question the prudence of unsupervised visitation, and has also admitted to being intimidated by Stoneman.

¶59 The overwhelming evidence in this case shows that there is at least some risk both

emotionally and physically to the children if they are left alone with their father. The judiciary cannot be blind to the effects that violent behavior has on children. Expert testimony was presented showing that violence in the home has a negative effect on children, whether they are physically harmed or not. It is well documented that witnessing domestic violence has a profound impact on children. See Peter G. Jaffe, et. al. *Children of Battered Women* (1990), *Comment: Child Witnesses of Domestic Violence: How Should Judges Apply the Best Interests of the Child Standard in Custody and Visitation Cases Involving Domestic Violence?* 47 UCLA L.Rev. 813.

¶60 The District Court had an obligation to consider the mental and emotional impact that unsupervised visitation would have on the children in light of Stoneman's history of violent behavior toward their mother. A parenting plan that consisted of supervised, well structured, visitation would not be to punish the father, but for the benefit of the children. While we sympathize with the plight of the District Court judge in dealing with these parties, and recognize that this is an extraordinarily complicated and difficult case, a full consideration of the best interests of the children should not be eclipsed by the unfortunate behavior of their parents.

¶61 We reverse the decision of the District Court to allow Stoneman unsupervised visitation of the children and remand for entry of judgment consistent with this opinion.

¶62 The abuse of process by both parties in this case is unprecedented. The voluminous record indicates the hostility that has permeated the relations between the parties. Drollinger and Stoneman have both exhibited extraordinarily uncivil behavior to the detriment of their children and many others who were unfortunate enough to be involved in this case. Both sides need to recognize that the courts are not available to solve each and every minute problem in their relationship. Unfortunately, Drollinger and Stoneman still have small children and need to begin to consider what is best for their children rather than the most effective way to injure each other.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ KARLA M. GRAY