No. 01-739

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 25

IN RE THE MARRIAGE OF:

MARK J. STONEMAN,

        Petitioner and Respondent,

    v.

RUTH L. DROLLINGER,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                 In and for the County of Gallatin,
                 The Honorable Mark L. Guenther, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                 Michael S. Kakuk, Helena, Montana

        For Respondent:

                 Karl Knuchel, Livingston, Montana

        For Amicus:

                 Patricia Novotny, Seattle, Washington; Shane P. Coleman, Dorsey &
Whitney,             Missoula Montana (Northwest Women's Law Center)

                          Heard:  October 15, 2002
                  Submitted:  October 29, 2002
                    Decided:  February 18, 2003

Filed:

_____
                     Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Ruth L. Drollinger appeals the denial of her motion requesting the court decline to exercise jurisdiction over a custody dispute with her former husband, Mark J. Stoneman.  In September 1999, Drollinger relocated with her four children to the State of Washington. The Uniform Child Custody Jurisdiction and Enforcement Act  (UCCJEA) enumerates domestic violence as one of eight factors that a Montana court must consider when determining whether it is an inconvenient forum to adjudicate child custody issues.   Although Stoneman's past acts of violence against Drollinger are well documented, the Eighteenth Judicial District Court, Gallatin County, failed to consider Drollinger's safety and well-being when evaluating whether transfer of proceedings to Washington is appropriate.  We hold that a finding of domestic violence authorizes a court to yield jurisdiction to another state if the victim could be better protected in the other forum and if the other statutory factors do not militate against the transfer.   We reverse and remand for further proceedings consistent with this Opinion.

¶2     The sole issue raised by Drollinger on appeal is whether the District Court erred by denying her motion to decline to exercise jurisdiction as an inconvenient forum under the UCCJEA.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Stoneman and Drollinger married on October 1, 1988, in Livingston, Montana.  On August 1, 1990, a few months after the birth of the couple's first child, Stoneman filed a petition for dissolution in Gallatin County.  Thereafter, the parties reconciled, reunited and broke-up numerous times before they finally separated in 1996 while Drollinger was pregnant with their fourth child. The children have resided with Drollinger since their parents' final separation.

¶4      Stoneman repeatedly battered Drollinger during the marriage and Drollinger obtained

2

several court-issued orders of protection during the parties' multiple separations. Stoneman pled guilty to partner and family member assault in 1990, 1991, 1994 and 1996. The record details Stoneman's violations of the orders of protection as well as several incidents involving Stoneman's violent behavior after the parties' final separation.

¶5 The District Court appointed a Guardian Ad Litem (GAL) in 1997 to represent the interests of the children in the dissolution proceedings. The GAL consistently recommended against Stoneman's unsupervised visitation with the children. In its October 23, 1998 decree of dissolution, the court divided the marital estate and awarded custody of the children to Drollinger. Drollinger, acting *pro se* and in *forma pauperis*, appealed the division of marital property, denial of a maintenance award, determination of child support and the visitation provisions of the parenting plan.

¶6 While the appeal was pending, Drollinger filed a notice of intent to move and relocated with her children to Washington in September 1999. The District Court in Montana directed Drollinger to bring the four children on alternate weekends from Washington to a designated location in Bozeman where the children's transfer to Stoneman for unsupervised visits was facilitated by a third party.

¶7 On November 30, 2000, this Court affirmed the District Court's judgment on the issues of property apportionment, maintenance and child support, but held that the court committed reversible error by allowing Stoneman unsupervised visitation with the children in light of his history of violence toward their mother. *Stoneman v. Drollinger*, 2000 MT 274, 302 Mont. 107, 14 P.3d 12. We noted that the overwhelming evidence in this case demonstrates an emotional and physical risk to the children if they are left alone with their father. *Stoneman*, ¶ 59. We remanded for entry of an

3

order requiring the children's visits with Stoneman to be supervised and well-structured. *Stoneman*, ¶ 61. Stoneman filed a petition for rehearing, which this Court denied.

¶8 On February 6, 2001, the Whitman County Superior Court of Washington issued a Permanent Order of Protection that bars Stoneman from all direct contact with Drollinger and the four children, except for Stoneman's supervised visitation, which had not yet been established by the Montana court.

¶9 On March 9, 2001, Drollinger, again acting *pro se* and *in forma pauperis,* filed a motion requesting the Montana court to decline jurisdiction as an inconvenient forum in order to allow the Whitman County, Washington court to assume jurisdiction. Stoneman opposed the motion. On May 3, 2001, the day set for a hearing on the parties' various motions, Drollinger moved to bifurcate property and parenting issues and requested the court decline jurisdiction over custody proceedings only. The court denied both of Drollinger's motions on September 10, 2001.

. **STANDARD OF REVIEW**

¶10 The standard of review of a motion to decline jurisdiction is whether the District Court abused its discretion. *In re Paternity and Custody of B.E.S.*, 1998 MT 90, ¶ 19, 190 Mont. 188, ¶ 19, 963 P.2d 449, ¶ 19 (citing *In re Marriage of Cook* (1986), 223 Mont. 293, 297, 725 P.2d 562, 564-65).

**DISCUSSION**

¶11 As a case of first impression, this Court is asked to examine the provisions of the UCCJEA that allow a Montana court to decline to exercise jurisdiction over child custody proceedings when the court determines that it is an inconvenient forum. For background, a brief discussion of the statutory schemes designed to address jurisdictional problems raised by interstate child custody

4

disputes is warranted.

¶12    In 1977, Montana adopted the Uniform Child Custody Jurisdiction Act (UCCJA) for the purpose of avoiding competition between states for jurisdiction over child custody proceedings and promoting cooperation of the courts by establishing uniform criteria for the state with the closest connections with the child to exercise jurisdiction.  Sec. 1, Ch. 537, L. 1977.  Although all 50 states, the District of Columbia and the Virgin Islands adopted the UCCJA, problems of interstate forum shopping and other jurisdictional disputes continued to vex the nation's courts.  *See* 9 Uniform Laws Annotated (U.L.A.) 650 (1999).

¶13    In 1980, the federal government enacted the Parental Kidnaping Prevention Act (PKPA), 28 U.S.C. § 1738A, which mandates that state authorities give full faith and credit to another state's custody determinations, so long as those determinations were made in conformity with the notice and procedural provisions of the PKPA.  The PKPA also authorizes continuing exclusive jurisdiction in the state that issued the original child custody decree so long as one parent or the child remains there and the state has continuing jurisdiction under its own law.  28 U.S.C. § 1738A(d).

¶14    To harmonize state child custody jurisdictional provisions with the PKPA and to eliminate inconsistent state court interpretations of jurisdictional issues, the National Conference of Commissioners on Uniform State Laws (NCCUSL) approved the UCCJEA in 1997 and recommended its enactment by all states.[1]  The Montana Legislature adopted the UCCJEA in 1999 (codified under Title 40, Chapter 7, Montana Code Annotated), which repealed and replaced the

---

[1]  As of January 2003, thirty-one states, including Washington and Montana, have enacted the UCCJEA, and nine states have introduced UCCJEA legislation.

provisions of the UCCJA in Montana law. *See* Sec. 1-14, Ch. 91, L. 1999.

¶15    Under the UCCJEA, a Montana court has jurisdiction to make a child custody determination if Montana is the "home state" of the child. Section 40-7-201(1), MCA. The "home state" is defined as the state in which a child lived with a parent or a person acting as parent for a least six months immediately before the commencement of a child custody proceeding. Section 40-7-103(7), MCA. As the "home state" of a child, Montana will continue to have exclusive, continuing jurisdiction unless a Montana court declines to exercise its jurisdiction. Section 40-7-202(2), MCA. A court may decline to exercise its jurisdiction at any time if the court determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum to make the child custody determination. Section 40-7-108(1), MCA.

¶16    To that end, the UCCJEA specifically mandates that a Montana court, at a minimum, consider the following factors when evaluating a motion to decline jurisdiction as an inconvenient forum:

(a) whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;

(b) the length of time that the child has resided outside this state;

(c) the distance between the court in this state and the court in the state that would assume jurisdiction;

(d) the relative financial circumstances of the parties;

(e) any agreement of the parties as to which state should assume jurisdiction;

(f) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(g) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

6

(h) the familiarity of the court of each state with the facts and issues in the pending litigation.

Section 40-7-108(2), MCA.

¶17    In the case before us on appeal, Stoneman contends that the criteria for evaluating inconvenient forum under the UCCJA are encompassed by the UCCJEA's requirement that courts consider "all relevant factors." He cites *In re Paternity and Custody of B.E.S.*, 1998 MT 190, 290 Mont. 188, 963 P.2d 449, as support for his position that it is not appropriate that Washington assume jurisdiction and determine pending visitation issues because his children have a closer connection with Montana, which is where the children have resided for most of their lives. Stoneman also argues that the Montana court should retain jurisdiction because the court has overseen the protracted litigation between the parties and Drollinger's effort to transfer jurisdiction is only an attempt to frustrate Stoneman's visitation with his children.

¶18    In *B.E.S.*, this Court interpreted the statutory criteria for determining inconvenient forum as it existed in 1998, prior to the Montana Legislature's enactment of the UCCJEA in 1999. However, the UCCJEA significantly altered the earlier provisions of § 40-7-108, MCA. For example, as noted in *B.E.S*, the UCCJA required a court to decide the jurisdiction question by resort to a determination "if it is in the interest of the child that another state assume jurisdiction." Section 40-7-108(3), MCA (1997); *B.E.S.*, ¶ 19. The UCCJEA includes no similar provision and eliminates "interest of the child" from the jurisdictional standard. *See* 9 U.L.A. 654. The UCCJA also did not include domestic violence as a factor that a court must consider in evaluating jurisdictional issues in child custody disputes. The UCCJEA, for the first time, focuses a court's attention on the safety and well-being of the victims of domestic violence when determining appropriate jurisdiction. Section 40-4-108(2)(a), MCA.

7

¶19 At oral argument before this Court, Stoneman conceded that the UCCJEA rather than the UCCJA governs this case. Also, the parties do not dispute that Montana is the "home state" for the four children. The children were born in Montana; child custody proceedings commenced in the Eighteenth Judicial District Court, Gallatin County; the Montana court made the initial child custody determination; and Stoneman continues to reside in Montana. Consequently, the Montana court has exclusive and continuing jurisdiction to establish Stoneman's supervised visitation with his children unless, under the circumstances, it would be appropriate for the Montana court to allow the Washington court to assume jurisdiction.

¶20 When evaluating whether to decline jurisdiction as an inconvenient forum, a court must allow the parties to submit information for the court's consideration. Section 40-7-108(2), MCA. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court. Section 40-7-108(1), MCA. The law does not allocate a burden of proof to either party, but directs the court to conduct an evaluation based upon the relevant information available to determine whether it is appropriate for another state to exercise jurisdiction. The District Court addressed each statutory factor in its decision denying the motion to decline jurisdiction, which we discuss in turn.

¶21 The first factor inquires "whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child." Section 40-7-108(2)(a), MCA. The District Court found that "[d]omestic violence towards Respondent is well documented in this case, but Respondent fails to show this [c]ourt how declining jurisdiction will better protect her and the children."

¶22 The UCCJEA places domestic violence at the top of the list of factors that courts are required

to evaluate when determining whether to decline jurisdiction as an inconvenient forum for child custody proceedings. Since domestic violence was not raised by the now-repealed UCCJA as a factor for court consideration, the NCCUSL, which drafted the UCCJEA, offered the following guidance to assist courts in applying this factor:

> For this purpose, the court should determine whether the parties are located in different States because one party is a victim of domestic violence or child abuse. If domestic violence or child abuse has occurred, this factor authorizes the court to consider which State can best protect the victim from further violence or abuse.

9 U.L.A. 683. The NCCUSL explicitly recognized that past abuse or a continuing threat of violence might compel a battered spouse or parent of an abused child to relocate to another state. The NCCUSL further directed courts to proceed with an evaluation of which forum can provide the greater safety whenever domestic violence or child abuse has occurred.

¶23 The priority the NCCUSL assigned to the protection of victims from further domestic violence is supported by the research findings of the United States Department of Justice. Those findings suggest that termination of an abusive relationship actually poses an increased risk of escalation in domestic violence. Interviews with men who killed their wives indicated that either threats of separation or actual separation most often precipitated events leading to the murder. *See* Patricia Tjanden and Nancy Thoennes, United States Department of Justice, *Extent, Nature, and Consequences of Intimate Partner Violence* 37 (July 2000). "Domestic violence often escalates over time in frequency, intensity and duration. . . . Although divorced women and separated women comprise only 10 percent of all women in America, they account for three-quarters of all battered women and report being battered 14 times as often as women still living with their partners.

9

Divorced or separated men, as opposed to husbands living with their wives, commit 79% of all spousal violence." Joan Zorza, *Recognizing and Protecting the Privacy and Confidentiality Needs of Battered Women,* 29 Fam. L. Q. 273, 274.

¶24    An alarming report from the State Justice Institute lists risk factors for intimate partner homicide recognized by a majority of domestic violence experts.  Identified indicators of homicidal potential are the batterer's access to or ownership of guns; use of weapons in prior abusive incidents; threats with weapons; serious injury in prior abusive incidents; threats of suicide; drug or alcohol abuse; forced sex with the female partner; obsessiveness; extreme jealousy; and extreme dominance.  *See* Jan Roehl and Kristin Guertin, State Justice Institute*, Current Use of Dangerous Assessments in Sentencing Domestic Violence Offenders* 3-7 (Sept. 1998) (hereafter, *Roehl*).

¶25    Orders of protection have proven inadequate to guard women and children from further abuse.  A recent two-year study of male batterers against whom an order of protection had been filed found that almost half of abusers assaulted their victims again within the study period.  The re-abuse rate did not differ for those who maintained the orders and those who dropped them.  Andrew R. Klein, United States Department of Justice, "Re-abuse in a Population of Court-Restrained Male Batterers: Why Restraining Orders Don't Work," *Legal Interventions in Family Violence: Research Findings and Policy Implications* 52 (July 1998).

¶26    Given the high propensity for recidivism in domestic violence, we hold that when a court finds intimate partner violence or abuse of a child has occurred or that a party has fled Montana to avoid further violence or abuse, the court is authorized to consider whether the party and the child might be better protected if further custody proceedings were held in another state.  While this factor alone is not dispositive under § 40-7-108, MCA, we urge district courts to give priority to the safety

of victims of domestic violence when considering jurisdictional issues under the UCCJEA.

¶27 Turning to the specific facts before us on appeal, the marriage of Stoneman and Drollinger was marked by repeated incidents of domestic violence. Local law enforcement officers arrested Stoneman on charges of partner and family member assault on numerous occasions between 1989 and 1996. Stoneman received four convictions and served a three-month sentence in the Park County Jail for the fourth conviction. When issues arising from the dissolution of the marriage between these parties were before this Court two years ago, we recounted the District Court's findings regarding two incidents that illustrate Stoneman's propensity for violence:

> A disagreement escalated between Mark and Ruth to the point of violence. To protect the children, Ruth, who was pregnant at the time, was forced to put them in the Suburban and drive away from Mark. It is uncontroverted that Mark, in his pickup truck, rammed into the Suburban, endangering the lives of his children and Ruth. Mark testified that he was trying to catch up to Ruth because in her hurry to protect her life and the lives of her children, he thought Ruth had not used seat belts for the children. The Court finds Mark's seat belt explanation incredible versus his threat to the safety of his children and Ruth.
> . . . .
> The second incident involved Mark painting his face with camouflage in the presence of the children, drinking, and driving out into the night, after hearing a story about Ruth. Mark's behavior was so bizarre that it frightened his friend Lisa Wolstad. Ms. Wolstad called 911 more than six times out of fear of what Mark would do. . . . Gallatin and Park County deputies pursued Mark and caught him near the I-90 interchange, dressed in camouflage and in possession of a gun.

*Stoneman,* ¶ 56.

¶28 Stoneman asserts on appeal that his last act of reported domestic violence occurred in 1996 and claims that there has been "no apparent problem" during the past three years. He contends that Drollinger only wants to obtain a more "sympathetic judge" by seeking the transfer of the remanded child custody proceedings to a court in Washington.

¶29 Drollinger testified at the May 2001 hearing on her motion to decline jurisdiction that she

11

relocated to Washington with the children in 1999 in order to be near her extended family. She stated that she preserved the confidentiality of her new address to escape a continuing threat of violence by Stoneman. Drollinger's mother and father, sister and brother and their families, as well as the children's paternal grandparents, live in Washington and Drollinger testified that they have provided emotional and material support to her and the children.

¶30    Drollinger entered into evidence the Permanent Order of Protection issued by the Whitman County, Washington court in February 2001. Noting that Stoneman stipulated to having committed domestic violence, the Washington court made no findings on the matter and noted that Stoneman disputed Drollinger's allegations of violence subsequent to 1997. Drollinger explained to the Montana court:

> I've needed to leave the state with my children because I have family in [Washington] state that can help me . . . . The only reason there's not more domestic violence that's been occurring is because I no longer live here and I have a--I've been able to--I have a permanent restraining order there.
> . . .
> There's been a number of things that has made me fearful for any way that he could find out where we live or, you know, where--what I'm doing or anything like that. I feel that my safety is still in question, Your Honor. I'm still afraid of him. I am being treated for post-traumatic stress disorder, Your Honor, from the years of domestic violence that I went through.

¶31    Drollinger's brief in support of her motion to decline jurisdiction referred the District Court to the supplemental information she submitted to this Court in September 2000, which documents Stoneman's "acts of violence and abuse towards [her] and the children since fleeing Montana" in September 1999. Although Drollinger did submit such documentation to this Court during her first appeal, we refused to consider the evidence. *Stoneman*, ¶ 12. This Court does not engage in fact-finding and may not consider evidence that has not been submitted to the court below for a proper hearing. Consequently, the documentation provided this Court regarding Stoneman's more recent

12

acts of violence is not of record.

¶32     While the record in this case is voluminous and the District Court acknowledged the well-documented history of domestic violence perpetrated by Stoneman against Drollinger throughout their ten-year marriage, the court made no new findings regarding violent acts or threats of violence since the October 1998 dissolution proceedings. The court also made no findings regarding threats or the likelihood of future violence before determining that Drollinger failed to demonstrate how she and the children would be safer if proceedings were transferred to Washington.

¶33     In her testimony before the District Court, Drollinger spoke of her fear of future violence by Stoneman and her efforts to prevent Stoneman from knowing her home address or her daily activities. Stoneman's criminal record of domestic violence reveals a pattern of recurrent wife-battering of escalating intensity, which includes severely beating Drollinger during pregnancy. The record also establishes that Stoneman used weapons in the context of spousal abuse, perpetrated serious injury upon his ex-spouse, and exhibited obsessive and domineering behavior, all of which correspond with indicators of homicidal potential identified by the State Justice Institute. *See Roehl,* 3-7. Stoneman testified at the May 2001 hearing that he had not received any type of psychological counseling since his last incarceration in 1996 for domestic violence. Moreover, he made no showing before the District Court that his potential for future violence has abated.

¶34     We conclude that the District Court abused its discretion when it acknowledged the well documented history of domestic violence presented by this case, yet neglected to consider which forum could best protect Drollinger and the children from further abuse. Drollinger maintains that she feels safer in Washington where she is surrounded by extended family and where Stoneman does not know her address or daily pattern of activities. Therefore, we hold that Washington is an

13

appropriate forum for further child custody proceedings in order to better protect Drollinger and the children from the threat of violence from Stoneman.

¶35    Although a finding of past domestic violence can be the basis for a Montana court to yield jurisdiction to another state, the seven other jurisdictional factors enumerated by § 40-7-108(2), MCA, must also be taken into consideration.  The second factor asks how long the children have resided outside Montana.  Section 40-7-108(2)(b), MCA.  The District Court found that the majority of the children's lives have been spent in Montana and "the [c]ourt does not believe that two (2) years in Washington weigh against retaining jurisdiction given the extensive history of the parties in the Montana [c]ourts."  The four children, ranging in age from four to eleven at the time of the hearing, have lived in Washington since September 1999.  Drollinger testified that the children "have significant connections to family, school and community" in Washington and have developed relationships that have enhanced their sense of security and well-being, which is "a contrast from the isolation they experienced while living in Montana."  As the children's home for the most recent two years, we conclude that Washington would be an appropriate forum for child custody proceedings.

¶36    The third factor evaluates the distance between the courts, which is approximately 600 miles in this case.  Section 40-7-108(2)(c), MCA.  The District Court stated, "[w]hile the court sympathizes with Respondent's need to relocate, she did choose to relocate a great distance from Petitioner."  Drollinger testified that the drive between her home and the court in Bozeman takes about eight hours each way.  As the primary custodial parent, Drollinger must either bring the children with her to proceedings or arrange for their care in her absence. Since the distance between the Montana and Washington courts creates a transportation inconvenience that must be borne by

14

one of the parties, we conclude that the facts suggest that Stoneman, as the noncustodial parent, may be in the better position to undertake the necessary travel.

¶37 The fourth factor concerns the relative financial circumstances of the parties, which the District Court found to be disparate. Section 40-7-108(2)(d), MCA. The court determined that Stoneman enjoys an income of $31,797, based in part on imputed wages, while Drollinger has an imputed income of $6,500. Under the fifth factor, the parties have no agreement regarding appropriate jurisdiction. Section 40-7-108(2)(e), MCA.

¶38 The sixth factor examines the traditional bases for determining venue and inquires about the nature and location of the evidence required to resolve the pending litigation, including the testimony of the children. Section 40-7-108(2)(f), MCA. The District Court stated that "Respondent contends all current evidence regarding the children's mental health, medical, financial, and school records are in Washington. The [c]ourt believes that Montana is just as convenient a forum as Washington for review of pertinent child records. . ."

¶39 Although records may be easily transportable, the District Court failed to address the convenience of the witnesses, the majority of whom reside in Washington, including the four children. Three of the children are enrolled in school and receive therapeutic counseling in Washington. Drollinger maintains that Washington is now the location of all witnesses and evidence regarding the children, with the single exception of the GAL who resides in Montana. The GAL testified at the May 2001 hearing that she actually has not seen the children for over one year, but has maintained contact by telephone. Stoneman did not refute Drollinger's assertions regarding the location of evidence and witnesses.

¶40 The seventh factor inquires about the ability of the court of each state to decide the issue

15

expeditiously and the procedures necessary to present the evidence. Section 40-7-108(2)(g), MCA. Although the District Court did not address this factor directly, we trust that courts in either Montana or Washington are competent to decide evidentiary and substantive issues expeditiously. The record does not indicate that the Montana court communicated with the Washington court to discuss the possible transfer of this case, pursuant to § 40-7-139, MCA. Consequently, no information is available regarding potential docketing problems or other concerns that might affect the Washington court's timely adjudication. Drollinger testified she has secured the services of a *pro bono* attorney to represent her through custody proceedings in Washington but has been unable to arrange for legal assistance in Montana.

¶41    The final factor is the familiarity of the court of each state with the facts and issues in the pending litigation. Section 40-7-108(2)(g), MCA. The District Court concluded that it is in the better position to address the issue of supervised visitation because the property and parenting issues arising from the dissolution of the marriage of Stoneman and Drollinger have been the subject of extensive litigation in Montana. The court noted that the case file is now in its thirteenth volume. While we acknowledge the extraordinary efforts of the Eleventh Judicial District Court to resolve the issues presented by this case--three district court judges have presided over the matter, and this is the second time that these parties have come before this Court on appeal--the value the court attaches to retaining jurisdiction is misplaced. For more than five years, the court system has served as a forum in which Stoneman and Drollinger have waged a contentious and protracted battle. While the Montana court may be well versed in the conflict, Drollinger argues that the Washington court also has had an opportunity to become familiar with the facts and issues involved in the case when she applied for and received a Permanent Order of Protection in 2001 from the Superior Court of

16

Whitman County. Therefore, under this factor, we again conclude that the Washington court would be an appropriate forum.

## CONCLUSION

¶42    It is the judgment of this Court that the protection of the parties, the years the children have resided in Washington, the significant distance between courts, the parties' disparate financial circumstances, the location of evidence and convenience of witnesses, and the familiarity factors, all support the Montana court declining jurisdiction to allow the Washington court to exercise jurisdiction.  None of the jurisdictional factors enumerated by § 40-7-108(2), MCA, militate against declination and no factor outweighs the concern for the safety and well-being of Drollinger and the children raised by the history of Stoneman's domestic violence.   Therefore, we conclude that Washington is the more appropriate forum in which a supervised, well-structured visitation plan for Stoneman may be established.

¶43    Accordingly, we reverse the District Court's order as it pertains to custody matters and remand with directions that the court stay further proceedings and communicate with the appropriate court in Washington to discuss transfer of this case, pursuant to § 40-7-139, MCA.   If transfer can be arranged, we direct the Montana court to decline jurisdiction as an inconvenient forum and hold that further proceedings should occur in Drollinger's home court.

¶44    Reversed and remanded.

/S/ JAMES C. NELSON

We Concur:

17

/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JIM RICE

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶45    I concur in much of the Court's opinion. However, I respectfully dissent from the result the Court reaches. I would remand.

¶46    The District Court denied Drollinger's motion to decline jurisdiction as an inconvenient forum. As the Court correctly states, our review of the District Court's decision is whether that court abused its discretion. Having properly begun to apply the correct standard, however, the Court takes it upon itself to make the ultimate decision about whether Montana is an inconvenient forum and, indeed, concludes that Washington is the "more appropriate" forum for this case. I cannot agree with the Court's approach.

¶47    I do agree with the first sentence in ¶ 34 of the opinion, where the Court determines that the District Court abused its discretion by neglecting to consider which forum could best protect Drollinger and the children. I also agree with ¶ 32 of the opinion, which lists other findings not made by the District Court. The Court then implicitly makes these missing findings of *fact*–an undertaking totally outside this Court's authority–in order to reach the conclusion it desires to make.

¶48    On this record, I conclude that the District Court abused its discretion by failing to make sufficient findings on the domestic violence matters. I would remand, however, for the entry of those findings and, thereafter, for reconsideration of the entire issue of a convenient forum under § 40-7-108, MCA. I simply cannot agree with this Court's choice to make the ultimate decision which properly belongs with the District Court.

/S/ KARLA M. GRAY

19