JUSTICE RICE
dissenting.
¶39 I dissent.
¶40 The Court purports to render an international custody jurisdictional decision on the basis of assertions which it describes as “facts.” In truth, much of the factual background which the Court offers in support of its decision is not premised on any factfinding at all *107 but is drawn from the briefing in this matter. Further, the Court completely ignores the only proper factfinding-that which is based upon discovery, sworn testimony of parties represented by counsel, cross-examination and credibility determinations by a neutral magistrate-which has been conducted in this case, that of the High Court of American Samoa. Concluding that American Samoa had no jurisdiction, the Court then refuses to consider the only credible evidence herein.
¶41 Indeed, the Court brushes aside the facts and declares, without evidentiary support, that “both parties have acted grievously in this matter with assertions of abuse, stalking and kidnapping.” Nothing could be further from the truth. While the Court may find such blame-spreading convenient, the evidence establishes that only Paslov has engaged in such behaviors-over many years.
¶42 The Court’s inadequate review mimics that of the District Court, which passed judgment on the Samoan order after only the briefest consideration. It made only the sparse finding that “the parties had an argument in the Wal Mart store in Butte, Montana after [Paslov] had been repeatedly denied visitation with his son,” and did so without benefit of a hearing with all parties present. This Court refers to that incident innocuously as a “publicly heated argument,” but worse, fails to acknowledge the mountain of evidence of Paslov’s repeated abuse beyond the Wal-Mart incident. In its opinion and order, which this Court chooses to ignore, the Samoan court concluded:
This court, unlike the Montana court, had the benefit of an inter partes adversarial trial. The evidence before us clearly shows that Respondent [Paslov] has a history of drug abuse and a demonstrated propensity for violence. Furthermore, Respondent’s recent pattern of hostility towards Petitioner [Cox] because of her proposed marriage culminating in the incident at the Montana Wal Mart, makes evident Respondent’s current instability and inability to cope with certain realities, namely Petitioner’s plan to remarry. We are not satisfied that Minor will not be subjected to these harms while in Respondent’s primary care, and therefore, exercise jurisdiction to protect the child’s best interest.
This conclusion is consistent with the background of the litigation. The original custody decree, entered in Oregon, designated Cox as Dylan’s primary custodian and restricted Paslov to supervised visitation for which he was required to pay Dylan’s transportation costs. Thus, two jurisdictions, Oregon and American Samoa, have reviewed this matter with proper factfinding, and both have concluded that Paslov should *108 not have custody of Dylan. However, this Court, without benefit of proper factfinding, reaches the opposite conclusion.
¶43 The Court attempts to avoid the facts by claiming this is “simply a jurisdictional matter.” See ¶ 24. However, it has erred in its application of jurisdictional principles as well. First, the Court minimizes Paslov’s stalking and violence by tritely declaring, without benefit of evidence, that “bad acts occurred on both sides.” However, this washing of Paslov’s abuse from the Court’s hands is incorrect as a matter of law. Domestic violence is a concern which the courts must consider superior to a victim’s relocation to another area to avoid such harm:
[W]e hold that when a court finds intimate partner violence or abuse of a child has occurred or that a party has fled Montana to avoid further violence or abuse, the court is authorized to consider whether the party and the child might be better protected if further custody proceedings were held in another state. ... [W]e urge district courts to give priority to the safety of victims of domestic violence when considering jurisdictional issues ....
Stoneman v. Drollinger, 2003 MT 25, ¶ 26, 314 Mont. 139, ¶ 26, 64 P.3d 997, ¶ 26 (emphasis added). Thus, Paslov’s death threats, physical assaults upon Cox, drug abuse and ongoing threats of stalking (for which there is evidentiary support) should be given priority consideration in considering jurisdictional questions. Today, the Court turns its back on that important principle.
¶44 In its next error of law, the Court concludes that American Samoa, at best, should have only exercised “temporary emergency jurisdiction under the PKPA” to protect Dylan. See ¶ 36. To the contrary, this was not an option for the Samoan court. “Temporary emergency jurisdiction” is not provided by the PKPA, but, rather, is authority provided by the UCCJEA, which the Montana Legislature adopted in 1999, and which is codified at Section 40-7-204, MCA. The error here is the failure to recognize that American Samoa has not adopted the UCCJEA, and, thus, cannot exercise “temporary” jurisdiction thereby. As explained herein, American Samoa assumes custodial jurisdiction in two ways: (1) under its common law, and (2) by reference to the Restatement (Second) of Conflict of Laws, § 79 (1971). Section § 79(b) of the Restatement, entitled “Custody of the Person,” mirrors the language in the PKPA regarding “emergency jurisdiction” without reference to the term “temporary.” See Restatement (Second) of Conflict of La ws § 79(b)(1971)(1988 Revisions). Therefore, American Samoa, which i s included under the terms of the *109 PKPA, properly proceeded under the jurisdiction available to it under the federal act: “emergency jurisdiction.” No reference to “temporary” jurisdiction exists in the PKPA.
¶45 To determine whether American Samoa properly acted to protect Dylan requires application of the two-pronged test for jurisdiction under 28 U.S.C. § 1738A(f)(l) and ©(2) of the PKPA. Specifically, a state court has jurisdiction for purposes of the PKPA if (1) it has custody jurisdiction under its own laws, 28 U.S.C. § 1738A(c)(l), and (2) one of the following five conditions is met: (a) home state jurisdiction, 28 U.S.C. § 1738A(c)(2)(A); (b) significant connection jurisdiction, 28 U.S.C. § 1738A(c)(2)(B); (c) emergency jurisdiction, 28 U.S.C. § 1738A(c)(2)(C); (d) default jurisdiction, 28 U.S.C. § 1738A(c)(2)(D); or (e) continuing jurisdiction, 28 U.S.C. § 1738A(c)(2)(E).
¶46 American Samoa exercises jurisdiction and modifies foreign custody decrees where the child in question is present in the territory. The High Court of American Samoa explained that Samoa exercises its jurisdictional authority under its common law and by reference to the Restatement (Second) of Conflict of Laws. See, e.g. In re Minor Child, 28 A.S.R.2d 33 (Trial Div. 1995); Restatement (Second) of Conflict of Laws § 79(b) (1971) (“A state has power to exercise jurisdiction to determine the custody ... of a child ... who is present in the state ....”). Although American Samoa has adopted neither the UCCJA nor the UCCJEA, such statutory basis for the proper exercise of jurisdiction over child custody determinations is not a requirement under the PKPA, which provides that a state need only “ha[ve] jurisdiction under the law of such State.” 28 U.S.C. § 1738A(c)(1). Thus, American Samoa’s exercise of jurisdiction based upon its finding that Dylan was present in the territory, and had, in fact, been there from July 8, 2000, was proper under its laws, and therefore satisfied the initial requirement of the PKPA.
¶47 However, for a child custody or visitation determination to be consistent with the PKPA, it is additionally necessary for a court to have met one of the five conditions enumerated in 28 U.S.C. § 1738A(c)(2). Subpart (c)(2) of the PKPA reveals that the High Court of American Samoa correctly noted in its July 17,2001, opinion and order awarding custody to Cox that only one of the five bases need be met. The Samoan court stated that it had jurisdiction if:
(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child *110 has been subjected to or threatened with mistreatment or abuse[.] Although the District Court stated in its July 22, 2002, enforcement order that “[a] reading of the decision of the Samoan court reveals that it did not determine its jurisdiction based on the exigent and emergency circumstances now urged by the Respondent [Cox],” it is evident from the foregoing excerpt of the Samoan court’s order that it did so.
¶48 The Court’s errors of law are evident from a reading of the authorities in the field, which address this precise situation. As noted by Minneman:
Where an emergency situation is alleged there is a clear tension between the goal of acting immediately to protect the child and the goal of not allowing the emergency jurisdictional provision of the UCC JA and PKPA to be used to end-run other jurisdictional rules. The temptation to a parent to cry emergency when there is no real emergency is no doubt strong, inasmuch as a loving parent often has little problem in convincing himself or herself that the established custody arrangement is harmful.... [Thus,] trial court judges would be advised to take a close look to determine if they should invoke emergency jurisdiction under the UCC JA or PKPA.
Minneman, 80 A.L.R. 5th at 142 (emphasis added). The Court today overlooks Minneman’s admonition that courts must “take a close look” at the facts to determine the jurisdictional question. Minneman, 80 A.L.R. 5th at 142. Instead, the Court completely ignores the facts found by the Samoan Court. The Samoan Court took a very close and very complete look at the facts in determining whether to invoke emergency jurisdiction, conducting a trial on the custody issue with both Cox and Paslov present and represented by counsel. The court heard testimony from Cox, Paslov, Warren, Diedre, and Don McGee, Cox’s fiance. Cox testified, and Warren’s deposition testimony corroborated, that on June 22, 2000, Paslov publicly threatened Cox and her children and said he was going to ruin her wedding, stalk her for the rest of her life, and make her miserable. As it turned out, this was but the tip of the iceberg of Paslov’s abuse. Beyond this incident-the only incident the District Court referenced-there were many others, demonstrating a pattern of abuse by Paslov over many years.
¶49 Cox further testified that during their nine-year marriage, Paslov had a history of drug abuse, using crack and cocaine regularly. She added that Paslov’s physical abuse was a fairly regular event which occurred in front of the children. She stated that in 1993 Paslov was *111 jailed for grabbing her by the neck. She further indicated that over the years she had been granted temporary restraining orders when Paslov physically hurt her, including one incident in which she sustained a broken wrist. Cox testified, and both Warren and Diedre corroborated, that Paslov had physically abused Warren, then aged 13, by grabbing him by the neck and slamming him against the wall, when he tried to intervene in an altercation between Paslov and Cox, who was then nine months pregnant with Dylan. Warren testified that he found drug paraphernalia and drugs in the house during the time his mother was married to Paslov, including cut-up straws, razor blades, and zip lock packages containing cocaine powder. Warren also testified that Paslov drank.
¶50 Warren, now aged 19, further characterized Paslov as a manipulative and dangerous man with whom he never liked being alone. Both Diedre and Warren testified that when Dylan, as an infant, was left in Paslov’s care, Paslov would leave the house in the middle of the night, leaving them to care for Dylan when he cried. At other times, Paslov would shake his fists at Dylan when he cried, or shake the crib and tell him to “just shut up.” Warren testified he heard Paslov tell Cox he hated her; and Cox testified Paslov said he hated Warren and Diedre, and hoped the baby (Dylan) would die.
¶51 Based upon the parties’ testimony at trial, the Samoan court entered detailed and complete findings of fact. It found that throughout the couple’s marriage, Paslov demonstrated an “unpredictably violent temperament” and “physical hostility.” Paslov “became obsessively concerned with the possibility of another father figure in his son’s life, and very resentful, if not outright jealous, over [Cox’s] proposed remarriage.” On June 22, 2000, four days before Paslov’s scheduled visit with Dylan, and two days before Cox’s marriage to McGee, Paslov “somehow managed to track down [Cox] while she shopped for things for her wedding at Wal Mart in Butte, Montana,” and “ranted and raved in the store” calling Cox, among other things, “an evil adulteress cunt,” and threatened to “ruin her wedding, stalk her for the remainder of her life, harm her and her children, and make the rest of her years miserable.”
¶52 The Samoan court further found that Cox had been primarily responsible for Dylan’s upbringing and his day-to-day needs, and that, as of the time of trial, she “continued to provide [Dylan] with a stable and nurturing environment.” The court found that while managing single parenthood, Cox had maintained gainful employment, but Paslov had not. The court also found significant Dylan’s interaction *112 with his two older siblings, both of whom had actively participated in his upbringing. The court stated that it was “not convinced of [Paslov’s] suitability for sole custody given his background with drug abuse coupled with his aggressive behavior.”
¶53 This is compelling testimony, offered by multiple parties under oath and subject to cross-examination. Yet the Court ignores this evidence in favor of a platitude not based on evidence: that both parties have been “bad.”
¶54 In its final error of law, the Court concludes that Montana retained “pending jurisdiction” of the matter following the entry of its order on September 11,2000, and therefore, American Samoa was not empowered to later act under the PKPA. See ¶ 37. However, for the first state to retain “pending” jurisdiction in a custody proceeding following its determination of custody, it must make a specific reservation or retention of jurisdiction to review the situation, to conduct further hearings, or to enter further orders. See Diane W. v. Norman W. (N.Y. 1982) 446 N.Y.S.2d 174, 175 (California’s interlocutory order stating “until further order of the court, which reserves jurisdiction in this regard,” sufficient to prohibit New York’s exercise of jurisdiction); Burch v. Burch (Fla. Ct. App. 1983), 424 So.2d 187, 188 (Florida erred in exercising jurisdiction where New York’s order stated, “matter will come on for review in March, 1982”); Zellat v. Zellat (Pa. Super. 1985), 506 A.2d 946, 950 (Pennsylvania could not exercise jurisdiction where Tennessee court ordered “further hearings” in the matter); Greene v. Greene (Fla. Ct. App. 1983), 432 So.2d 62, 62 (Florida court erred in assuming jurisdiction where Virginia court stated that it “retained jurisdiction over the subject matter”).
¶55 In the case subjudice, although the District Court’s September 11, 2000, order granting custody to Paslov required the parties to undergo further psychological evaluations, the order does not indicate what, if any, further action was contemplated by the court. Under the case law, this ambiguity in purpose was insufficient to reserve “pending jurisdiction,” as defined by the PKPA, for purposes of barring the exercise of emergency jurisdiction by American Samoa.
¶56 Based upon the foregoing, the District Court’s conclusion that it retained subject matter jurisdiction was an incorrect interpretation of law under the PKPA. The District Court lost “continuing” jurisdiction when the child and both contestants relocated outside of the state. It retained “pending” jurisdiction only until September 11, 2000, when its custody order was entered. Thereafter, American Samoa was eligible to exercise emergency jurisdiction under the limited *113 circumstances allowed under the PKPA.
¶57 It may appear counterintuitive and contrary to traditional jurisprudence to conclude that a court can acquire jurisdiction for purposes of determining custody, only to lose jurisdiction to another state following its custody determination because the custody matter is no longer “pending.” However, it must be understood that the loss of both “continuing” and “pending” jurisdiction is a limited possibility under the PKPA and occurs here only because of the very unique facts: the child and both parents were permanently located outside the state, and a custody proceeding was no longer pending in this state. It must also be understood that this loss of jurisdiction is possible under the PKPA in order to fulfill a narrow, but vital, purpose: to authorize another state to exercise jurisdiction under very specific circumstances-here, for American Samoa to protect the child in an alleged emergency.
¶58 The District Court’s inadequate review of the American Samoan decision led it to conclude that the Samoan court “did not determine its jurisdiction based on ... exigent and emergency circumstances.” However, to the contrary, the Samoan court concluded that “[t]he circumstances in this case clearly create an emergency substantial enough to confer upon this court jurisdiction to protect Minor from Respondent [Paslov].” Likewise, this Court has turned its back on the evidence, rejected a sister state’s careful action to protect a child from abuse, and made an error of great significance. I dissent.
JUSTICE NELSON joins in the foregoing dissent of JUSTICE RICE.