No. 95-383

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

IN RE THE MARRIAGE OF

YANCY W. SHUPE,

    Petitioner and Appellant,

  and

PAMELA J. SHUPE,

    Respondent and Respondent.

FILED

MAY 10 1996

~~Ed Smith~~
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Stillwater,
The Honorable Russell C. Fagg, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

      Robert Eddleman, Attorney at Law, Columbus,
Montana

    For Respondent:

      Jill Deann Miller, Attorney at Law, Billings,
Montana


Submitted on Briefs:  January 18, 1996

Decided:  May 10, 1996

Filed:

_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Yancy W. Shupe (Yancy) appeals from the Findings of Fact, Conclusions of Law and Order of the Thirteenth Judicial District Court, Stillwater County, denying his petition for modification of custody. The court based the denial on its conclusions that it did not have subject matter jurisdiction to modify custody under the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A, and that Yancy failed to satisfy the statutory requirements for modification. We affirm.

The dispositive issues on appeal are:

1. Is Yancy's appeal properly before us?

2. Did the District Court err in concluding that it did not have subject matter jurisdiction to modify custody under the Parental Kidnapping Prevention Act?

Yancy and Pamela Shupe (Pamela) are the parents of a minor child, Megan Shupe (Megan). Before the events at issue in this case, the family resided in Utah. In October of 1993, Yancy moved to Nye, Montana, to work at the Stillwater Mine; Pamela and Megan remained in Utah. Yancy and Pamela's marriage was dissolved by a Utah district court on January 12, 1994. In the decree of dissolution, the court granted Pamela sole custody of Megan and awarded Yancy liberal visitation rights.

Pamela and Megan remained in Utah immediately following the dissolution of the parties' marriage. The record reflects that, between April of 1994 and January of 1995, Pamela and Megan went back and forth between Montana and Utah on numerous occasions.

2

Yancy moved some of Pamela's belongings to Montana in July of 1994. The parties agree that Pamela and Megan lived with Yancy in Montana from January of 1995 until sometime in March of that year.

On March 9, 1995, Pamela and Megan were involved in a single-car accident while returning to Nye from Dean, Montana; neither Pamela nor Megan was injured. Pamela was cited for driving under the influence of alcohol (DUI) and pleaded not guilty. Pamela and Megan returned to Utah later that month and lived with Pamela's mother.

In April of 1995, Yancy moved the District Court for a temporary order changing Megan's custody to him. He also petitioned for modification of custody pursuant to § 40-4-219, MCA. The District Court concluded that it did not have subject matter jurisdiction to modify custody under the Parental Kidnapping Prevention Act (PKPA) and, further, that Yancy failed to satisfy the statutory requirements for modification of custody. Yancy appeals. Additional facts are set forth below where necessary to our resolution of the issues.

1. Is Yancy's appeal properly before us?

Pamela contends that the District Court's order merely denied Yancy's motion for temporary custody and that such an order is not appealable under Rule 1, M.R.App.P. While we agree with Pamela that Rule 1, M.R.App.P., does not authorize an appeal from an order denying a motion for temporary change of custody, we disagree that the District Court's May 30, 1995, order was a mere denial of such a motion.

Yancy filed a motion for a temporary order changing custody and a petition for modification of custody under § 40-4-219, MCA, on the same date. The District Court held a hearing on May 14, 1995. The record reflects that, at the beginning of the hearing, the parties and the court were confused as to whether the hearing was limited to Yancy's motion for temporary custody or whether his petition for modification also was being heard. The District Court first indicated that only Yancy's motion for temporary custody was before it, then indicated that it also would hear Yancy's petition for modification of custody and, finally, indicated again that only the motion for temporary custody was being heard.

The District Court's findings of fact, conclusions of law and order state at the outset, and without further clarification, that "[t]his matter" was heard on May 14, 1995. The court's findings and conclusions address both jurisdiction and custody modification. Regarding the latter, the court concluded that Yancy had not met the requirements of § 40-4-219, MCA, and denied Yancy's "petition."

On the basis of the record before us, we cannot conclude that the District Court's order was limited to denying Yancy's motion for a temporary change of custody. We conclude that the order at issue substantively denied Yancy's § 40-4-219, MCA, petition for modification of custody on the bases of lack of subject matter jurisdiction and failure to satisfy the statutory requirements for custody modification. As a result, we hold that the District Court's order is appealable under Rule 1, M.R.App.P., and that Yancy's appeal is properly before us.

4

2. Did the District Court err in concluding that it did not have subject matter jurisdiction to modify custody under the PKPA?

*A. APPLICABILITY OF THE PKPA*

All fifty states have adopted the Uniform Child Custody Jurisdiction Act (UCCJA) in some form to address interstate custody disputes. See Meade v. Meade (4th Cir. 1987), 812 F.2d 1473, 1475. However, the UCCJA was found to be inadequate in addressing the problems of forum shopping and "child snatching" because it operated at the state level. Erler v. Erler (1993), 261 Mont. 65, 69, *862* P.2d 12, 15. Moreover, as the Utah Court of Appeals observed in Curtis v. Curtis (Utah Ct. App. 1990), 789 P.2d 717, 721 n.9, the UCCJA creates the possibility of several states having concurrent jurisdiction over child custody determinations.

Congress enacted the PKPA in 1980 to establish national standards under which the courts of various states could determine whether they had jurisdiction in a child custody proceeding and what effect to give custody determinations by courts of other jurisdictions. Erler, 862 P.2d at 15. Under the PKPA, full faith and credit ordinarily must be given to a custody determination made by a court of another state if that court appropriately exercised jurisdiction under PKPA standards. See *28* U.S.C. § 1738A(a); Erler, *862* P.2d at 15.

Two underlying purposes of the PKPA are to discourage continuing interstate controversies over child custody and to facilitate the enforcement of custody determinations of sister states. Erler, 862 P.2d at 15 (citation omitted). In this regard,

5

the PKPA prevents the issuance of *competing* decrees of sister states. Erler, 862 P.2d at 16 (citing Nielsen v. Nielsen (La. 1985), 472 So. 2d 133, 136). Thus, the PKPA sets forth standards for determining the **one** state with jurisdiction to modify an existing custody order. See 28 U.S.C. §§ 1738A(d) and (f); Curtis, 789 P.2d at 721.

The purposes of the PKPA are achieved through both 28 U.S.C. §§ 1738A(d) and (f). 28 U.S.C. § 1738A(d) provides for continuing jurisdiction in the state in which the original child custody determination was made so long as certain enumerated requirements are satisfied (see Erler, 862 P.2d at 15), while 28 U.S.C. § 1738A(f) allows a court of a different state to modify a custody determination only when it has jurisdiction to make such a determination under its own laws and the court which made the original custody determination no longer has jurisdiction or has declined to exercise such jurisdiction (see Meade, 812 F.2d at 1476-77). Thus, Congress' enactment of 28 U.S.C. §§ 1738A(d) and (f) remedied the problem of possible concurrent jurisdiction present in the UCCJA. Accordingly, where the PKPA applies, necessary jurisdictional determinations must be made thereunder.

Yancy argues that, pursuant to Erler, the PKPA does not apply to his petition for modification of custody. His reliance on Erler, however, is misplaced.

In Erler, the parties' marriage was dissolved by a Montana district court in Missoula County and the mother was granted sole custody of the parties' minor children. The mother and children

subsequently moved to Seattle, Washington and, thereafter, the father moved to modify custody in the district court in Missoula County. Erler, *862* P.2d at 13. On appeal, we affirmed the district court's determination that it did not have subject matter jurisdiction under the PKPA, concluding that the PKPA did not apply because Montana was the only state involved in the custody dispute. Erler, *862* P.2d at 16.

Here, Yancy petitioned a Montana court for modification of the Utah court's child custody determination regarding Megan. Thus, unlike in Erler, two states are involved in this custody dispute. The PKPA was enacted by Congress to address such a situation and to prevent the issuance of conflicting and competing custody decrees in sister states. Erler, 862 P.2d at 16. We conclude, therefore, that the PKPA is applicable here. Accordingly, we turn to the issue of whether the District Court erred in concluding that it did not have subject matter jurisdiction to modify custody under the PKPA.

### B. SUBJECT MATTER JURISDICTION UNDER THE PKPA

The PKPA generally requires the courts of a state to enforce-- and decline to modify--child custody determinations made by the courts of other states. *28* U.S.C. § 1738A(a). A specific exception to the general rule authorizes a court to modify a child custody determination made by a court in another state when two requirements are satisfied: (1) the court has jurisdiction to make a child custody determination; and (2) the court of the other state no longer has jurisdiction or has declined to exercise

7

jurisdiction.    28 U.S.C. § 1738A(f).

*(1) Analysis of Montana Jurisdiction*

Under the first requirement of 28 U.S.C. § 1738A(f), a Montana district court must have jurisdiction to make the child custody determination pursuant to Montana law.    See 28 U.S.C. § 1738A(f)(1). Since the custody dispute in this case has interstate ramifications, Montana's version of the UCCJA governs whether a Montana district court has jurisdiction to make a custody determination under Montana law.    See §§ 40-7-101 through 40-7-125, MCA.    Section 40-7-104, MCA, provides that " [t]he jurisdictional provisions of 40-4-211 apply to this chapter."

Section 40-4-211(1), MCA, sets forth four alternative bases under which a Montana district court has jurisdiction to "make a child custody determination by initial or modification decree." Because the statute is written in the disjunctive, only one of the stated bases need exist in order for a Montana court to have jurisdiction under Montana law.    The District Court addressed each alternative and concluded that it did not have jurisdiction to make a custody determination under § 40-4-211(1), MCA. Given the facts of this case, it is appropriate to limit our review to the District Court's findings and conclusion under the § 40-4-211(1)(b), MCA, basis for jurisdiction.

Section 40-4-211, MCA, provides in pertinent part:

(1) A court of this state competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
. . . .
(b) it is in the best interest of the child that a court of this state assume jurisdiction because:

8

> (i) the child and his parents or the child and at least one contestant have a significant connection with this state; and
> (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships . . . .

The District Court found that neither the "significant connection" factor referenced in § 40-4-211(1)(b)(i), MCA, nor the "substantial evidence" factor referenced in § 40-4-211(1)(b)(ii), MCA, was satisfied in this case. Based on those findings, the District Court concluded that it did not have jurisdiction pursuant to § 40-4-211(1)(b), MCA, to make a custody determination.

We review a district court's findings of fact to determine whether the findings are clearly erroneous. In re Marriage of Brownell (1993), 263 Mont. 78, 81, 865 P.2d 307, 309 (citation omitted). A court's findings are clearly erroneous if they are not supported by substantial evidence, the court misapprehends the effect of the evidence, or our review of the record convinces us that a mistake has been committed. Marriage of Brownell, 865 P.2d at 309 (citation omitted). We review a district court's conclusions of law to determine if the court's interpretation of the law is correct. In re Marriage of Kovash (1995), 270 Mont. 517, 521, 893 P.2d 860, 863 (citation omitted).

The District Court found that "[t]here are not significant contacts with Montana" and did not further elucidate. Although the District Court used the language "significant contacts," it apparently was referring to the "significant connection" factor contained in § 40-4-211(1)(b)(i), MCA; as set forth above, that statutory subsection, as it pertains to this case, requires that

9

Megan and either Yancy or Pamela have a significant connection with Montana.

Here, Yancy lives and works in Montana and, as a result, clearly has a significant connection with this state. Indeed, Pamela does not dispute Yancy's significant connection with Montana and the court did not find otherwise. With regard to Megan's connection to Montana, the record reflects that she resided in Montana for nearly three months almost immediately preceding Yancy's petition. In addition, she has visited Montana on numerous occasions and for varying periods of time since the parties' divorce. Moreover, the record indicates that Megan's paternal grandmother lives in Montana.

Pamela argues that "[t]here is clearly sufficient evidence in the record to support the District Court's determination" and, in support of her argument, sets forth facts of record indicating that Megan has a significant connection with Utah. However, evidence that Megan has a significant connection with Utah does not equate to a lack of a significant connection with Montana.

We note that the District Court's ultimate finding that "[t]here are not significant contacts with Montana" is irreconcilable with its underlying findings regarding Megan's, and even Pamela's, connection with Montana. For example, the court found that Yancy and Pamela "both agree that [Pamela and Megan] resided in Montana from January, 1995 until March, 1995." The court further found that Pamela opened a bank account in Montana in January of 1995 and that Pamela and Megan spent "periods of 1994"

10

in Montana. Thus, the District Court's finding that there are not significant "contacts" with Montana is not supported by substantial evidence and is clearly erroneous.

In light of the District Court's multiple findings regarding Pamela and Megan's connection with Montana and the evidence of record as set forth above, it is clear that Megan had a significant connection with Montana as required by § 40-4-211(1)(b)(i), MCA. As previously stated, the parties do not dispute that Yancy has a significant connection with Montana and the District Court did not find otherwise. Thus, the additional § 40-4-211(1)(b)(i), MCA, requirement that one of the contestants also have a significant connection with Montana is satisfied in this case.

The District Court also found that there is not substantial evidence in Montana concerning Megan's present or future care, protection, training and personal relationships. Pamela argues that the District Court's finding in this regard is supported by substantial evidence because she and Megan "were only in Montana for a short period of time." However, evidence that Megan and Pamela were only in Montana for a "short period of time" does not necessarily mean that substantial evidence regarding Megan's present and future care, protection, training and personal relationships does not exist in Montana. Moreover, § 40-4-211(1)(b)(i), MCA, which contains the foregoing "substantial evidence" prerequisite to jurisdiction, is not time-related.

The record contains the following evidence which exists in Montana and which the District Court did not address in ultimately

11

finding that there is not substantial evidence in Montana regarding Megan's present and future care, protection, training and personal relationships. Officer Silk It Wak Rivera, the highway patrol officer who investigated Pamela and Megan's accident, testified about the details of the accident and Pamela's DUI citation. Marilyn Kober, the Stillwater County Justice of the Peace, testified that Pamela had alcohol on her breath when she appeared on her DUI charge. Moreover, the record reflects that Pamela and Yancy's neighbors and friends in Nye, Montana, have information about the parties' roles in caring for Megan. For example, Cleo Eberhart (Cleo) testified that she did not have any concerns about Pamela's capabilities as a mother and that she thought Pamela was a good mother. Cleo further testified that Pamela was Megan's primary caregiver. Finally, as previously stated, Yancy and his mother--who is Megan's paternal grandmother--live in Montana. In light of the foregoing evidence, we conclude that the District Court's finding that there is not substantial evidence in Montana regarding Megan's present or future care, protection, training and personal relationships for jurisdictional purposes under § 40-4-211(1) (b) (ii), MCA, is not supported by substantial evidence and, therefore, is clearly erroneous.

Based on our conclusions that the District Court's jurisdictional findings under § 40-4-211(1) (b), MCA, are clearly erroneous, we hold that the District Court erred in concluding that it did not have jurisdiction under § 40-4-211(1), MCA, to make a custody determination.

12

The fact that Montana has jurisdiction under its own laws to make a custody determination does not, however, resolve the issue of whether the District Court has jurisdiction under the PKPA to modify the original Utah custody determination. In order to do so, the second requirement of 28 U.S.C. § 1738A(f) also must be met; namely, that Utah no longer has jurisdiction or has declined to exercise such jurisdiction to modify its earlier custody determination. See 28 U.S.C. § 1738A(f)(2). Yancy did not file a motion or petition for modification of custody in Utah and the parties agree that Utah has not declined to exercise jurisdiction. Therefore, our review is limited to the District Court's conclusion that Utah did not lose jurisdiction over matters relating to Megan's custody.

Utah's version of the UCCJA, set forth at Title 78, Chapter 45c of the Utah Code Annotated, governs whether Utah district courts have jurisdiction. Section 78-45c-3, Utah Code Ann., like § 40-4-211(1), MCA, sets forth four alternative bases under which a Utah district court would have jurisdiction to "make a child custody determination by initial or modification decree." The District Court found that, when this proceeding was commenced in April of 1995, Utah was Megan's home state. Based on that finding, the court concluded that "Utah did not lose its jurisdiction."

Under § 78-45c-3(1)(a)(i), Utah Code Ann., Utah has jurisdiction if Utah was, in fact, Megan's home state at the time Yancy commenced these proceedings. Section 78-45c-2(5), Utah Code

13

Ann., defines "home state" as "the state in which the child immediately preceding the time involved lived with his parents [or] parent . . for at least six consecutive months. . . ." Yancy and Pamela agree that Megan lived in Montana with them from January until sometime in March of 1995. Therefore, the District Court's finding that Utah was Megan's home state is not supported by substantial evidence and is clearly erroneous.

Notwithstanding the District Court's erroneous finding, however, the court's conclusion that Utah has jurisdiction over matters involving Megan's custody is not necessarily incorrect. It is well-established that we will affirm a district court's decision which reaches the right result, regardless of the court's reasoning. See Farmer's Union Cent. Exch. v. Department of Revenue (1995), 272 Mont. 471, 475, 901 P.2d 561, 563; Bohmer v. Uninsured Employers' Fund (1994), 266 Mont. 289, 291, 880 P.2d 816, 817.

Under Utah law, as in Montana, another basis for jurisdiction over custody determinations is that it is in the child's best interests for Utah to assume jurisdiction because the child and at least one contestant have a significant connection with Utah and there exists in Utah substantial evidence regarding the child's present and future care, protection, training and personal relationships. See § 78-45c-3(1)(b), Utah Code Ann. We note that the District Court did not address this basis for Utah jurisdiction, presumably because it concluded that Utah was Megan's home state.

The record contains the following evidence regarding Pamela

14

and Megan's connection with Utah. Megan was born in Utah and has lived there most of her life, with the exception of approximately three months in which she lived in Montana and periods of time in 1994 when she visited Montana. After leaving Montana in March of 1995, Pamela and Megan returned to Utah and lived with Pamela's mother and Megan's maternal grandmother, Ivy Northlander. Additionally, Pamela's other children, who are Megan's half-siblings, live in Utah. Thus, the record reflects that both Pamela and Megan have a significant connection with Utah.

The record also reflects that substantial evidence exists in Utah concerning Megan's present and future care, protection, training and personal relationships. For example, Lonni Watson, a friend of Pamela's in Utah, testified that she did not have any concerns about Pamela's ability to care for Megan and that Pamela "spoils [Megan] rotten." Additionally, Pamela's mother, Ivy, testified regarding Pamela's relationship with Megan. Ivy testified that Pamela and Megan were living with her in Utah and that Megan was well cared for by Pamela.

In light of the foregoing evidence, we conclude that, at the time Yancy petitioned the District Court for modification of Utah's custody determination, Utah had jurisdiction to make a child custody determination under § 78-45c-3(1)(b), Utah Code Ann. Thus, we hold that the District Court's conclusion that Utah did not lose jurisdiction is correct. We observe, in this regard, that our conclusions that Montana and that Utah both have jurisdiction under their respective laws to make a child custody determination

15

illustrate the problems regarding concurrent jurisdiction which can arise under the UCCJA and which were remedied by enactment of the PKPA.

Since Utah has jurisdiction to make a custody determination, the requirement of 28 U.S.C. § 1738A(f)(2)--that Utah no longer has jurisdiction to make a child custody determination or declined to exercise such jurisdiction--is not satisfied. Thus, notwithstanding that the requirement of 28 U.S.C. § 1738A(f)(1)--that Montana has jurisdiction to make a custody determination under Montana law--is satisfied, the District Court was not authorized to modify the original Utah custody determination regarding Megan under 28 U.S.C. § 1738A(f). Accordingly, we hold that the District Court correctly concluded that it did not have subject matter jurisdiction under the PKPA to modify Utah's original custody determination in this case.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

16