No. 02-656

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 325

EUGENE JOSEPH PASLOV,

Petitioner and Respondent,

v.

KATHLEEN M. COX,

Respondent and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and for the County of Powell, Cause No. DV-2000-28,
The Honorable Ted Mizner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Christian T. Nygren, Milodragovich, Dale, Steinbrenner & Binney, P.C.,
Missoula, Montana

For Respondent:

Ronald F. Waterman, Gough, Shanahan, Johnson & Waterman, Helena,
Montana

Submitted on Briefs:  February 20, 2003

Decided:  November 17, 2004

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1     This appeal involves a custody dispute between Kathleen M. Cox (Cox) and Eugene Joseph Paslov (Paslov) regarding their minor son, Dylan.  At the time of this appeal, two courts, the Third Judicial District Court, Powell County, Montana, and the High Court of American Samoa, had rendered conflicting custody determinations regarding Dylan.  Cox appeals from the July 22, 2002, order of the Third Judicial District Court which enforced an earlier parenting plan issued on September 11, 2000, over a custody order issued by the High Court of American Samoa on July 17, 2001.  We affirm.

¶2     Cox presents the following issues on appeal:

¶3     1.  Whether the District Court erred in failing to recognize the custody order entered by the High Court of American Samoa.

¶4     2.  Whether the District Court erred in modifying the original parenting plan issued by the State of Oregon by awarding sole custody of Dylan to Paslov.

¶5     Paslov presents the following issue on cross-appeal:

¶6     Whether Cox timely appealed the District Court's September 11, 2000, custody order.  Because we affirm on Appellant's Issue 1, it is not necessary to reach either Appellant's Issue 2 or Respondent's issue on cross-appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7     Paslov and Cox were married in Nevada on February 5, 1991, and later moved to Oregon.  At the time of their marriage, Cox had two older children from a previous marriage, Diedre and Warren Enteron.  Paslov and Cox had one child together, Dylan, born November 8, 1994.  The parties were divorced in Oregon on March 14, 1999.  The final parenting plan

2

issued by the Oregon court granted sole custody of Dylan to Cox and provided that Paslov pay $300 per month child support. Additionally, the Oregon Court granted the parties' agreed upon parenting plan which provided that Paslov have regular visitation on alternating weekends with Dylan at his paternal grandparent's home in Carson City, Nevada, with Paslov to pay for air transportation for Dylan, who would be accompanied by an adult (either Cox, Deidre or Warren). Paslov was to have parenting time with Dylan on Dylan's birthday, alternating holidays and for one month during the summer after notifying Cox of the time period by May 1 of each year.

¶8 After the divorce, Paslov moved back to Nevada and, sometime in the fall of 1999, Cox moved to Deer Lodge, Montana, in anticipation of her marriage the following summer to Don McGee, a Butte resident. Paslov asserts this move was made without notification, which Cox denies. Whatever the case, ongoing relations between the parties proved difficult, and visitation between Paslov and Dylan was sporadic. Paslov asserts Cox's relocation was an attempt to deny his opportunity to visit Dylan. Cox counters Paslov's failure to pay for Dylan's airfare to Carson City was the reason for any visitation difficulty Paslov may have encountered.

¶9 Paslov then traveled to Helena, Montana, and secured an attorney to initiate modification to the parenting plan for more visitation time with Dylan. On April 3, 2000, Paslov filed in the Third Judicial District Court (1) a petition to recognize and register the Oregon parenting plan, and (2) a motion to amend the Oregon parenting plan. The motion requested Cox remain Dylan's sole custodian, but that Paslov be granted expanded visitation with Dylan.

3

¶10 On May 18, 2000, in response to Paslov's petition, Cox stipulated that the District Court could recognize and register the Oregon decree of dissolution and final parenting plan and assume jurisdiction over the parenting plan proceedings. However, she objected to Paslov's request for modification of the parenting plan. The following day, the District Court also granted an *ex parte* motion by Paslov requiring Cox to produce Dylan for a weekend visit in Butte, Montana.

¶11 On May 22, 2000, the District Court, noting that both Cox and Dylan were residing in Deer Lodge, Montana, and that Dylan had significant contacts in the State of Montana, issued an order in which it recognized and registered the Oregon decree of dissolution and parenting plan as a valid decree. It also accepted jurisdiction in all matters involving the custody and visitation of Dylan, including Paslov's motion for amending the parenting plan and all other subsequent actions.

¶12 While Paslov's motion to modify the parenting plan was pending before the District Court, relations between Cox and Paslov worsened. Among other things, Paslov was angry because he was not receiving his phone calls from Dylan, and Cox was angry that Paslov was insisting upon his court-ordered parent-child contact for the summer. On June 16, 2000, Cox filed a motion to hold Paslov in contempt for failure to pay thousands of dollars in child support. Then, on June 22, 2000, four days before Paslov was to pick up Dylan for his month-long summer visitation, Paslov and Cox had a publicly heated argument at a Wal-Mart in Butte. During this argument, Cox asserts Paslov threatened to ruin her upcoming wedding, stalk her for the rest of her life, and harm both her and her children. On June 28, 2000, Paslov filed an *ex parte* motion to enforce the parenting plan regarding the summer

4

parent-child visitation, which was subsequently granted.

¶13 Following this public scene and Paslov's *ex parte* motion, Cox petitioned the Silver Bow Justice of the Peace for a temporary restraining order (TRO), which was granted. However, the order was almost immediately rescinded when Justice Court learned that a custodial proceeding was pending in District Court.

¶14 Cox was never served with the *Ex Parte* Order for Parent-Child Contact regarding the summer visit; nor was she notified of the rescinded TRO. She was not notified because she left Montana with Dylan and returned to American Samoa, her homeland, asserting safety concerns for herself and her children. Cox left without notice to either Paslov or the District Court, she was not found, and Paslov did not receive any parent-child contact in the summer of 2000.

¶15 On August 1, 2000, Paslov amended his pending motion to request he receive sole custody of Dylan. Paslov also requested Cox's contact with Dylan be restricted to supervised visitation, Cox undergo a psychological evaluation, and Cox pay Paslov's attorney fees and costs.

¶16 On September 7, 2000, the District Court conducted a hearing on Paslov's petition to change Dylan's custody. Cox was not in attendance at the hearing, despite being served notice of the hearing both at her last known address and by publication. On September 11, 2000, the District Court granted Paslov's petition and awarded sole custody to Paslov. Additionally, the court ordered Cox have no parent-child contact with Dylan, unless and until she submit to, and successfully complete, a full psychological evaluation. Once the evaluations were complete, the therapist would provide a written report to the District Court

5

regarding a recommendation for visitation between Cox and Dylan so the court could determine what, if any, parent-child contact Cox should have with Dylan. In fact, the court order specifies that both parents participate in psychological evaluations in order for the court to have complete and well-rounded information. The court also terminated Paslov's child support obligations, and awarded Paslov attorney fees and costs. Additionally, the court ordered that all law enforcement agencies were to continue their efforts in searching for Cox and Dylan, as their whereabouts were still unknown at that time.

¶17 On November 22, 2000, Cox filed an action in the American Samoan court system to modify the September 11, 2000, order of the District Court. She sought to be designated as the exclusive custodian of Dylan. On April 5, 2001, The High Court of American Samoa conducted a trial on Cox's petition in which both Cox and Paslov personally appeared with counsel. Paslov contested the jurisdiction of the Samoan court and requested it recognize the District Court's jurisdiction over the parenting plan.

¶18 On July 17, 2001, the High Court of American Samoa entered its opinion and order, concluding it had jurisdiction over the matter and that Dylan's interests would best be served by residing with his mother. It modified the District Court's September 11, 2000, order by granting sole custody to Cox, with reasonable supervised visitation rights to Paslov. Paslov initially appealed the Samoan decision, but subsequently withdrew his appeal.

¶19 On March 7, 2002, Paslov filed a motion in District Court to enforce its September 11, 2000, custody order. On the same date, Dylan's paternal grandparents also filed a motion in District Court to enforce grandparent contact with Dylan. Cox responded with a motion to quash on the basis that the Samoan Court had jurisdiction over this matter. On

6

July 22, 2002, after briefs and oral arguments were submitted, the District Court issued an order granting both Paslov's motion to enforce its September 11, 2000, custody order and the grandparents' motion for increased grandparent visitation.

¶20   While Paslov's motions were pending, Cox entered into negotiations with the Powell County Attorney's office regarding an earlier charge of Parenting Interference, a felony, pursuant to § 45-5-634, MCA, for her removal of Dylan from Montana. These negotiations resulted in a March 22, 2002, deferred prosecution agreement in which Cox agreed to not violate any Montana laws for a period of one year and to follow all valid court orders issued in this matter.

¶21   On August 20, 2002, Cox filed a Writ of Supervisory Control with this Court, alleging the District Court erred in failing to recognize the jurisdiction of the High Court of American Samoa to issue a modified parenting plan which awarded custody to her. We denied the writ on grounds an appeal would provide an adequate remedy for the error alleged by Cox. On October 10, 2002, Cox filed a notice of appeal of the District Court's July 22, 2002, enforcement order. Paslov filed a motion to dismiss the appeal as untimely. We denied Paslov's motion, concluding Cox's appeal, although filed beyond thirty days after the order, was nonetheless timely filed under Rule 5(c), M.R.App.P., because a notice of the entry of judgment had never been served.

**STANDARD OF REVIEW**

¶22   We review a district court's findings of fact to determine whether the findings are clearly erroneous. *In re Marriage of Shupe* (1996), 276 Mont. 409, 416, 916 P.2d 744, 748 (citation omitted). We review a district court's conclusions of law to determine if the court's

7

interpretation of the law is correct. *Shupe*, 276 Mont. at 416, 916 P.2d at 748 (citation omitted).

## DISCUSSION

¶23 The District Court correctly assumed jurisdiction of the Oregon Parenting Plan and modified it to award Paslov sole custody of Dylan. The Samoan Court subsequently asserted jurisdiction over the Montana modification and awarded Cox sole custody of Dylan. As maintained by Cox, the resolution of these conflicting custody determinations must be decided under the federal Parental Kidnaping Prevention Act[1] (PKPA), 28 U.S.C. § 1738A, which sets forth jurisdictional guidelines in face of competing custody decisions by sister states. Cox asserts that under the PKPA: (1) Montana does not have exclusive jurisdiction over this custody dispute, and (2) American Samoa properly exercised jurisdiction in rendering its custody decision. Conversely, Paslov argues the District Court never lost jurisdiction over this matter.

¶24 While both parties have acted grievously in this matter with assertions of abuse, stalking and kidnaping, the case before us is simply one of a jurisdictional matter. The essential question in this case is which of two state courts had jurisdiction to make a custody determination involving Dylan: the District Court or the Samoan Court,[2] which have rendered opposing custody determinations.

---

[1] *See Erler v. Erler* (1993), 261 Mont. 65, 69, 862 P.2d 12, 15, where the complete text of the Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A, is set forth in footnote 1 of that opinion.

[2] The PKPA applies to American Samoa since the PKPA defines "state" as including "a territory or possession of the United States." 28 U.S.C. § 1738A(b)(8).

¶25 The Uniform Child Custody Jurisdiction Act (UCCJA) has been adopted in all fifty states, the District of Columbia and the Virgin Islands. *Stoneman v. Drollinger*, 2003 MT 25, ¶ 12, 314 Mont. 139, ¶ 12, 64 P.3d 997, ¶ 12. The UCCJA was created "to remedy th[e] intolerable state of affairs where self-help and the rule of 'seize and run' prevail . . . ." Lansing & Sherman, *The Legal Response to Child Snatching*, 7 J.Juv.L. 16, 19 (1983) (quoting UCCJA, Commissioners' Prefatory Note, 9 Uniform Laws Annotated (ULA) 112 (1979)). In 1999, the Montana Legislature adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), which repealed and replaced the UCCJA provisions in Montana law. *Stoneman*, ¶ 14.

¶26 However helpful the uniform enactments have been, they nonetheless operate in large part at the state level, while the parental conduct they are designed to prevent is essentially interstate in nature. Thus, in 1980, the federal government enacted the PKPA to establish national standards addressing the continuing problems of forum shopping and child snatching. Full faith and credit must ordinarily be given to a custody determination made by a court of another state if that court appropriately exercised jurisdiction under PKPA standards. *See* 28 U.S.C. § 1738A(a); *Erler v. Erler* (1993), 261 Mont. 65, 69, 862 P.2d 12, 15; *Shupe*, 276 Mont. at 414, 916 P.2d at 747.

¶27 For convenience, we will refer to the state that originally entered the custody decree as the "District Court," and the state that modified that decree as the "Samoan court." The PKPA provides in pertinent part:

> **§ 1738A. Full faith and credit given to child custody determinations**.
>
> (a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h)

of this section, any custody determination or visitation determination made consistently with the provisions of this section by a court of another State.

. . . .

(c) A child custody or visitation determination made by a court of a State is consistent with the provisions of this section only if—
     (1)  such court has jurisdiction under the law of such State; and
     (2)  one of the following conditions is met:
     (A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;
     (B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;
     (C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse;
     (D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody or visitation of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or
     (E) the court has continuing jurisdiction pursuant to subsection (d) of this section.

(d)  The jurisdiction of a court of a State which has made a child custody or visitation determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

. . . .

(f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if—

    (1) it has jurisdiction to make such a child custody determination; and

    (2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination.

28 U.S.C. § 1738A(a), (c)(1), (c)(2), (d), (f), (g). These provisions of the PKPA provide that a second state may only modify the custody decree of the first state in very limited circumstances, even though both states may have an interest in the matter.

¶28 Subsection (f) is the key modification provision of the PKPA and creates a two-pronged test for courts to apply. Before a second state may modify the decree of the first state, (1) the second state must have jurisdiction under its own laws, 28 U.S.C. § 1738A(f)(1); and (2) the first state must have lost or given up its jurisdiction, both "continuing" and "pending." 28 U.S.C. § 1738A(f)(2). If the first state has neither lost nor refused jurisdiction, there would be no need to ascertain whether the second state has authority to assume jurisdiction. Thus, we turn to the question of Montana's jurisdiction.

### Montana's Jurisdiction over the Oregon Parenting Plan

¶29 The State of Montana may assume jurisdiction for purposes of modifying a child custody determination when a conflict arises involving a disparate decree from sister states under the UCCJEA, codified at § 40-7-203, MCA, which provides:

**Jurisdiction to modify determination.** Except as otherwise provided in 40-7-204, a court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under 40-7-201(1)(a) or (1)(b) and:

11

(1) the court of the other state determines it no longer has exclusive, continuing jurisdiction under 40-7-202 or that a court of this state would be a more convenient forum under 40-7-108; or

(2) a court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

Section 40-7-201(1)(a) and (1)(b), MCA, referenced in § 40-7-203, MCA, provides:

**Initial child custody jurisdiction.** (1) Except as otherwise provided in 40-7-204, a court of this state has jurisdiction to make an initial child custody determination only if:

(a) this state is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(b) a court of another state does not have jurisdiction under subsection (1)(a), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under 40-7-108 or 40-7-109, and:

(i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(ii) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships . . . .

In sum, under the UCCJEA, in order to modify a determination made by a court of another state, a Montana court must have jurisdiction under § 40-7-201(1)(a), MCA, *or* § 40-7-201(1)(b)(i) and (ii), MCA; *and* § 40-7-203(1), MCA, *or* § 40-7-203(2), MCA.

¶30     In its order accepting jurisdiction over the Oregon parenting plan, the District Court found that both Cox and Dylan were residing in Deer Lodge and that Dylan had significant contacts in Montana. Additionally, a review of the record reveals that Cox and Dylan moved to Montana in the fall of 1999, most likely in October, which would have established the

12

requisite six-month "home state" criteria of § 40-7-201(1)(a), MCA,[3] prior to Paslov's filing of his April 2000 motion to amend the Oregon parenting plan. Neither party asserts that the six-month period was not satisfied. The District Court's finding of "significant contacts" constitutes fulfillment of only part of the requisite criteria of § 40-7-201(1)(b), MCA, specifically, subpart (i). However, fulfillment of § 40-7-201(1)(b), MCA, is not necessary in light of fulfillment of the criteria of § 40-7-201(1)(a), MCA, as long as § 40-7-203(1) or § 40-7-203(2), MCA, is met. The court's finding that Dylan and Cox were residing in Montana meets the requirement of § 40-7-203(2), MCA ("the child, [and] the child's parents . . . do not presently reside in the other state"). Thus, Montana met the requisite jurisdictional requirements under § 40-7-201(1)(a) and § 40-7-203(2), MCA. Additionally, the record reflects that Cox specifically stipulated to Montana jurisdiction. Therefore, we accept as appropriate Montana's initial decision and exercise of jurisdiction over the Oregon parenting plan leading to its order of September 11, 2000.

¶31 The question then becomes whether the District Court retained that jurisdiction under subsection (d) of the PKPA.

**Montana's Jurisdiction under the PKPA**

¶32 The PKPA enables a sister state to modify a child custody determination of the first state when (1) it has jurisdiction to make such a child custody determination under its own laws; *and* (2) the court of the first state no longer has jurisdiction, either by losing jurisdiction or declining to exercise such jurisdiction to modify such determination. 28

---

[3] "Home state" means the state in which a child lived with a parent or a person acting as parent for at least 6 consecutive months immediately before the commencement of a child custody proceeding. Section 40-7-103(7), MCA.

U.S.C. § 1738A(f); *Erler*, 261 Mont. at 70, 862 P.2d at 15-16. Therefore, before a second state may modify a decree of the first state, the first state must have lost or given up its "continuing" or "pending" jurisdiction. If Montana has not lost jurisdiction, the Samoan Court has no authority to assume jurisdiction, and instead, it must enforce the Montana custody determination. 28 U.S.C. § 1738A(a).

¶33 A state retains "continuing" jurisdiction as long as it satisfies two requirements: (1) it has jurisdiction under its own law, and (2) it remains the residence of the child or any of the contestants. 28 U.S.C. § 1738A(d). If a state has "continuing" jurisdiction, other states must enforce, and may not modify, the custody determination by the first state. Here, at the time the District Court made its September 11, 2000, custody determination awarding sole custody to Paslov, the District Court had jurisdiction under § 40-7-203, MCA, satisfying the first requirement of § 1738A(d): jurisdiction under its own law. Nevertheless, the second requirement of subsection (d)–the state remains the residence of the child or any of the contestants–was no longer satisfied as of July 8, 2000, when Cox and Dylan relocated to American Samoa. Although Cox and Dylan were no longer in Montana because Cox removed Dylan across state lines while custody proceedings were pending in Montana, an act which the PKPA was designed to prevent, the fact remains that neither of the parties nor the child resided in Montana. Thus, Montana did not retain "continuing" jurisdiction as that term is defined for the specific purposes of the PKPA.

¶34 However, the PKPA also provides that, in addition to "continuing" jurisdiction, the first state may also retain "pending" jurisdiction. Subsection (g) of the PKPA directs a court to abstain from exercising jurisdiction in "any proceeding for a custody or visitation

14

determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of [the Act] to make a custody or visitation determination." 28 U.S.C. § 1738A(g). Thus, the question is whether, following the District Court's custody order of September 11, 2000, it retained "pending jurisdiction" of the matter at the time Cox initiated the action in American Somoa on November 22, 2000.

¶35 Judge Mizner's order of September 11, 2000, clearly provides that he was anticipating psychological reports from licensed therapists for further custody and visitation determinations. Additionally, the court ordered that the search for Cox's whereabouts continue and be reported back to it. Further, Cox, in her deferred prosecution for Parental Interference, agreed to follow all valid court orders issued in this matter. All of these demonstrate the District Court still had "pending" proceedings that ultimately were going to impact the custody and visitation of Dylan.

¶36 While it is not necessary for further analysis, we will briefly review Cox's argument that American Samoa could exercise emergency jurisdiction pursuant to the PKPA. The PKPA provides for emergency jurisdiction when the child is physically present in the state and it is necessary in an emergency to protect the child because the child has been "subjected to or threatened with mistreatment or abuse." 28 U.S.C. § 1738A(c)(2)(C)(ii). Cox asserts her decision to return to American Samoa was based on fear because Paslov had threatened her life and the lives of her children, and that Paslov had a propensity for violence. Paslov, conversely, characterizes Cox's actions as a "secret flight to Samoa" for the purpose of unilaterally "snatching" the child in hopes of finding another forum in which she could

15

obtain a more favorable outcome. Even if Cox's allegations of Paslov's drug abuse, violent propensities and fear for her and her children's lives are true, at best, the Samoan court should only have exercised temporary emergency jurisdiction under the PKPA whereby it protected Dylan from substantial and imminent harm and continued emergency jurisdiction only until the proper forum was determined; and in this case, that forum is the Montana court system. In fact, the District Court found that Cox "had several legal remedies available to her to protect herself and her child from [Paslov] in this jurisdiction if in fact she felt threatened by him." Instead, Cox left the jurisdiction without notice to either Paslov or the District Court.

¶37 It must be remembered that the purpose of the UCCJEA, and the PKPA, is to prevent precisely what occurred here, the removal of a child from one jurisdiction to another, in order to obtain a different result regarding custody or other matters affecting the minor child. While bad acts occurred on both sides of this case, it remains that under the law, Cox cannot divest Montana of jurisdiction simply by removing Dylan to American Samoa, which does not recognize the UCCJEA, thereby to restart the entire issue. We are satisfied the District Court was fully aware of and properly applied the correct law in addressing this jurisdictional issue. We conclude the District Court did not decline jurisdiction to American Samoa, and instead retained jurisdiction under the "pending" jurisdiction provision of the PKPA.

¶38 The District Court's order is affirmed.

/S/ JIM REGNIER

16

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART

Justice Jim Rice dissenting.

¶39 I dissent.

¶40 The Court purports to render an international custody jurisdictional decision on the basis of assertions which it describes as "facts." In truth, much of the factual background which the Court offers in support of its decision is not premised on any factfinding at all but is drawn from the briefing in this matter. Further, the Court completely ignores the only proper factfinding–that which is based upon discovery, sworn testimony of parties represented by counsel, cross-examination and credibility determinations by a neutral magistrate–which has been conducted in this case, that of the High Court of American Samoa. Concluding that American Samoa had no jurisdiction, the Court then refuses to consider the only credible evidence herein.

¶41 Indeed, the Court brushes aside the facts and declares, without evidentiary support, that "both parties have acted grievously in this matter with assertions of abuse, stalking and kidnapping." Nothing could be further from the truth. While the Court may find such blame-spreading convenient, the evidence establishes that only Paslov has engaged in such behaviors–over many years.

¶42 The Court's inadequate review mimics that of the District Court, which passed judgment on the Samoan order after only the briefest consideration. It made only the sparse finding that "the parties had an argument in the Wal Mart store in Butte, Montana after [Paslov] had been repeatedly denied visitation with his son," and did so without benefit of a hearing with all parties present. This Court refers to that incident innocuously as a "publicly heated argument," but worse, fails to acknowledge the mountain of evidence of

18

Paslov's repeated abuse beyond the Wal-Mart incident. In its opinion and order, which this Court chooses to ignore, the Samoan court concluded:

> This court, unlike the Montana court, had the benefit of an *inter partes* adversarial trial. The evidence before us clearly shows that Respondent [Paslov] has a history of drug abuse and a demonstrated propensity for violence. Furthermore, Respondent's recent pattern of hostility towards Petitioner [Cox] because of her proposed marriage culminating in the incident at the Montana Wal Mart, makes evident Respondent's current instability and inability to cope with certain realities, namely Petitioner's plan to remarry. We are not satisfied that Minor will not be subjected to these harms while in Respondent's primary care, and therefore, exercise jurisdiction to protect the child's best interest.

This conclusion is consistent with the background of the litigation. The original custody decree, entered in Oregon, designated Cox as Dylan's primary custodian and restricted Paslov to supervised visitation for which he was required to pay Dylan's transportation costs. Thus, two jurisdictions, Oregon and American Samoa, have reviewed this matter with proper factfinding, and both have concluded that Paslov should not have custody of Dylan. However, this Court, without benefit of proper factfinding, reaches the opposite conclusion.

¶43 The Court attempts to avoid the facts by claiming this is "simply a jurisdictional matter." *See* ¶ 24. However, it has erred in its application of jurisdictional principles as well. First, the Court minimizes Paslov's stalking and violence by tritely declaring, without benefit of evidence, that "bad acts occurred on both sides." However, this washing of Paslov's abuse from the Court's hands is incorrect as a matter of law. Domestic violence is a concern which the courts must consider superior to a victim's relocation to another area to avoid such harm:

> [W]e hold that when a court finds *intimate partner violence or abuse of a child has occurred or that a party has fled Montana to avoid further violence or abuse,* the court is authorized to consider whether the party and the child

19

might be better protected if further custody proceedings were held in another state. . . . *[W]e urge district courts to give priority to the safety of victims of domestic violence when considering jurisdictional issues . . . .*

*Stoneman v. Drollinger,* 2003 MT 25, ¶ 26, 314 Mont. 139, ¶ 26, 64 P.3d 997, ¶ 26 (emphasis added). Thus, Paslov's death threats, physical assaults upon Cox, drug abuse and ongoing threats of stalking (for which there is evidentiary support) should be given priority consideration in considering jurisdictional questions. Today, the Court turns its back on that important principle.

¶44 In its next error of law, the Court concludes that American Samoa, at best, should have only exercised "temporary emergency jurisdiction under the PKPA" to protect Dylan. *See* ¶ 36. To the contrary, this was not an option for the Samoan court. "Temporary emergency jurisdiction" is not provided by the PKPA, but, rather, is authority provided by the UCCJEA, which the Montana Legislature adopted in 1999, and which is codified at Section 40-7-204, MCA. The error here is the failure to recognize that American Samoa has not adopted the UCCJEA, and, thus, cannot exercise "temporary" jurisdiction thereby. As explained herein, American Samoa assumes custodial jurisdiction in two ways: (1) under its common law, and (2) by reference to the *Restatement (Second) of Conflict of Laws*, § 79 (1971). Section § 79(b) of the *Restatement*, entitled "Custody of the Person," mirrors the language in the PKPA regarding "emergency jurisdiction" without reference to the term "temporary." *See Restatement (Second) of Conflict of Laws* § 79(b)(1971)(1988 Revisions). Therefore, American Samoa, which is included under the terms of the PKPA, properly proceeded under the jurisdiction available to it under the federal act: "emergency jurisdiction." No reference to "temporary" jurisdiction exists in the PKPA.

20

¶45    To determine whether American Samoa properly acted to protect Dylan requires application of the two-pronged test for jurisdiction under 28 U.S.C. § 1738A(f)(1) and (f)(2) of the PKPA.  Specifically, a state court has jurisdiction for purposes of the PKPA if (1) it has custody jurisdiction under its own laws, 28 U.S.C. § 1738A(c)(1), and (2) one of the following five conditions is met: (a) home state jurisdiction, 28 U.S.C. § 1738A(c)(2)(A); (b) significant connection jurisdiction, 28 U.S.C. § 1738A(c)(2)(B); (c) emergency jurisdiction, 28 U.S.C. § 1738A(c)(2)(C); (d) default jurisdiction, 28 U.S.C. § 1738A(c)(2)(D); or (e) continuing jurisdiction, 28 U.S.C. § 1738A(c)(2)(E).

¶46    American Samoa exercises jurisdiction and modifies foreign custody decrees where the child in question is present in the territory.  The High Court of American Samoa explained that Samoa exercises its jurisdictional authority under its common law and by reference to the *Restatement (Second) of Conflict of Laws*.  *See, e.g. In re Minor Child*, 28 A.S.R.2d 33 (Trial Div. 1995); *Restatement (Second) of Conflict of Laws* § 79(b) (1971) ("A state has power to exercise jurisdiction to determine the custody . . . of a child . . . who is present in the state . . . .").  Although American Samoa has adopted neither the UCCJA nor the UCCJEA, such statutory basis for the proper exercise of jurisdiction over child custody determinations is not a requirement under the PKPA, which provides that a state need only "ha[ve] jurisdiction under the law of such State." 28 U.S.C. § 1738A(c)(1). Thus, American Samoa's exercise of jurisdiction based upon its finding that Dylan was present in the territory, and had, in fact, been there from July 8, 2000, was proper under its laws, and therefore satisfied the initial requirement of the PKPA.

¶47 However, for a child custody or visitation determination to be consistent with the PKPA, it is additionally necessary for a court to have met one of the five conditions enumerated in 28 U.S.C. § 1738A(c)(2). Subpart (c)(2) of the PKPA reveals that the High Court of American Samoa correctly noted in its July 17, 2001, opinion and order awarding custody to Cox that only one of the five bases need be met. The Samoan court stated that it had jurisdiction if:

> (C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse[.]

Although the District Court stated in its July 22, 2002, enforcement order that "[a] reading of the decision of the Samoan court reveals that it did not determine its jurisdiction based on the exigent and emergency circumstances now urged by the Respondent [Cox]," it is evident from the foregoing excerpt of the Samoan court's order that it did so.

¶48 The Court's errors of law are evident from a reading of the authorities in the field, which address this precise situation. As noted by Minneman:

> Where an emergency situation is alleged there is a clear tension between the goal of acting immediately to protect the child and the goal of not allowing the emergency jurisdictional provision of the UCCJA and PKPA to be used to end-run other jurisdictional rules. The temptation to a parent to cry emergency when there is no real emergency is no doubt strong, inasmuch as a loving parent often has little problem in convincing himself or herself that the established custody arrangement is harmful. . . . [Thus,] trial court judges would be advised to *take a close look* to determine if they should invoke emergency jurisdiction under the UCCJA or PKPA.

Minneman, 80 A.L.R. 5th at 142 (emphasis added). The Court today overlooks Minneman's admonition that courts must "take a close look" at the facts to determine the jurisdictional question. Minneman, 80 A.L.R. 5th at 142. Instead, the Court completely ignores the facts

22

found by the Samoan Court. The Samoan Court took a very close and very complete look at the facts in determining whether to invoke emergency jurisdiction, conducting a trial on the custody issue with both Cox and Paslov present and represented by counsel. The court heard testimony from Cox, Paslov, Warren, Diedre, and Don McGee, Cox's fiancé. Cox testified, and Warren's deposition testimony corroborated, that on June 22, 2000, Paslov publicly threatened Cox and her children and said he was going to ruin her wedding, stalk her for the rest of her life, and make her miserable. As it turned out, this was but the tip of the iceberg of Paslov's abuse. Beyond this incident–the only incident the District Court referenced–there were many others, demonstrating a pattern of abuse by Paslov over many years.

¶49     Cox further testified that during their nine-year marriage, Paslov had a history of drug abuse, using crack and cocaine regularly. She added that Paslov's physical abuse was a fairly regular event which occurred in front of the children. She stated that in 1993 Paslov was jailed for grabbing her by the neck. She further indicated that over the years she had been granted temporary restraining orders when Paslov physically hurt her, including one incident in which she sustained a broken wrist. Cox testified, and both Warren and Diedre corroborated, that Paslov had physically abused Warren, then aged 13, by grabbing him by the neck and slamming him against the wall, when he tried to intervene in an altercation between Paslov and Cox, who was then nine months pregnant with Dylan. Warren testified that he found drug paraphernalia and drugs in the house during the time his mother was

23

married to Paslov, including cut-up straws, razor blades, and zip lock packages containing cocaine powder. Warren also testified that Paslov drank.

¶50 Warren, now aged 19, further characterized Paslov as a manipulative and dangerous man with whom he never liked being alone. Both Diedre and Warren testified that when Dylan, as an infant, was left in Paslov's care, Paslov would leave the house in the middle of the night, leaving them to care for Dylan when he cried. At other times, Paslov would shake his fists at Dylan when he cried, or shake the crib and tell him to "just shut up." Warren testified he heard Paslov tell Cox he hated her; and Cox testified Paslov said he hated Warren and Diedre, and hoped the baby (Dylan) would die.

¶51 Based upon the parties' testimony at trial, the Samoan court entered detailed and complete findings of fact. It found that throughout the couple's marriage, Paslov demonstrated an "unpredictably violent temperament" and "physical hostility." Paslov "became obsessively concerned with the possibility of another father figure in his son's life, and very resentful, if not outright jealous, over [Cox's] proposed remarriage." On June 22, 2000, four days before Paslov's scheduled visit with Dylan, and two days before Cox's marriage to McGee, Paslov "somehow managed to track down [Cox] while she shopped for things for her wedding at Wal Mart in Butte, Montana," and "ranted and raved in the store" calling Cox, among other things, "an evil adulteress cunt," and threatened to "ruin her wedding, stalk her for the remainder of her life, harm her and her children, and make the rest of her years miserable."

24

¶52 The Samoan court further found that Cox had been primarily responsible for Dylan's upbringing and his day-to-day needs, and that, as of the time of trial, she "continued to provide [Dylan] with a stable and nurturing environment." The court found that while managing single parenthood, Cox had maintained gainful employment, but Paslov had not. The court also found significant Dylan's interaction with his two older siblings, both of whom had actively participated in his upbringing. The court stated that it was "not convinced of [Paslov's] suitability for sole custody given his background with drug abuse coupled with his aggressive behavior."

¶53 This is compelling testimony, offered by multiple parties under oath and subject to cross-examination. Yet the Court ignores this evidence in favor of a platitude not based on evidence: that both parties have been "bad."

¶54 In its final error of law, the Court concludes that Montana retained "pending jurisdiction" of the matter following the entry of its order on September 11, 2000, and therefore, American Samoa was not empowered to later act under the PKPA. *See* ¶ 37. However, for the first state to retain "pending" jurisdiction in a custody proceeding following its determination of custody, it must make a specific reservation or retention of jurisdiction to review the situation, to conduct further hearings, or to enter further orders. *See Diane W. v. Norman W.* (N.Y. 1982) 446 N.Y.S.2d 174, 175 (California's interlocutory order stating "until further order of the court, which reserves jurisdiction in this regard," sufficient to prohibit New York's exercise of jurisdiction); *Burch v. Burch* (Fla. Ct. App. 1983), 424 So.2d 187, 188 (Florida erred in exercising jurisdiction where New York's order stated,

25

"matter will come on for review in March, 1982"); *Zellat v. Zellat* (Pa. Super. 1985), 506 A.2d 946, 950 (Pennsylvania could not exercise jurisdiction where Tennessee court ordered "further hearings" in the matter); *Greene v. Greene* (Fla. Ct. App. 1983), 432 So.2d 62, 62 (Florida court erred in assuming jurisdiction where Virginia court stated that it "retained jurisdiction over the subject matter").

¶55   In the case *sub judice*, although the District Court's September 11, 2000, order granting custody to Paslov required the parties to undergo further psychological evaluations, the order does not indicate what, if any, further action was contemplated by the court. Under the case law, this ambiguity in purpose was insufficient to reserve "pending jurisdiction," as defined by the PKPA, for purposes of barring the exercise of emergency jurisdiction by American Samoa.

¶56   Based upon the foregoing, the District Court's conclusion that it retained subject matter jurisdiction was an incorrect interpretation of law under the PKPA. The District Court lost "continuing" jurisdiction when the child and both contestants relocated outside of the state. It retained "pending" jurisdiction only until September 11, 2000, when its custody order was entered. Thereafter, American Samoa was eligible to exercise emergency jurisdiction under the limited circumstances allowed under the PKPA.

¶57   It may appear counterintuitive and contrary to traditional jurisprudence to conclude that a court can acquire jurisdiction for purposes of determining custody, only to lose jurisdiction to another state following its custody determination because the custody matter is no longer "pending." However, it must be understood that the loss of both "continuing"

26

and "pending" jurisdiction is a limited possibility under the PKPA and occurs here only because of the very unique facts: the child and both parents were permanently located outside the state, and a custody proceeding was no longer pending in this state. It must also be understood that this loss of jurisdiction is possible under the PKPA in order to fulfill a narrow, but vital, purpose: to authorize another state to exercise jurisdiction under very specific circumstances–here, for American Samoa to protect the child in an alleged emergency.

¶58 The District Court's inadequate review of the American Samoan decision led it to conclude that the Samoan court "did not determine its jurisdiction based on . . . exigent and emergency circumstances." However, to the contrary, the Samoan court concluded that "[t]he circumstances in this case clearly create an emergency substantial enough to confer upon this court jurisdiction to protect Minor from Respondent [Paslov]." Likewise, this Court has turned its back on the evidence, rejected a sister state's careful action to protect a child from abuse, and made an error of great significance. I dissent.

/S/ JIM RICE

Justice James C. Nelson joins in the foregoing dissent of Justice Rice.

/S/ JAMES C. NELSON